**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Yolanda Mays *in her individual capacity and as Trustee for the heirs and next of kin of Tommy Holmes*, | Case No. 24-cv-01736 (LMP/ECW) |
| Plaintiff, | |
| v. | **ORDER** |
| Andrew William Schroeder *acting in his individual capacity*, Mark Joseph Suchta *acting in his individual capacity*, Alan Douglas Salvosa *acting in his individual capacity*, and City of Minneapolis, | |
| Defendants. | |

This matter is before the Court on Plaintiff's Motion for Discovery Sanctions against Defendant Salvosa (Dkt. 34). For the reasons stated below, the Court grants the motion insofar as Plaintiff seeks attorneys' fees as a sanction pursuant to Federal Rule of Civil Procedure 37(e)(1) and otherwise denies the Motion.

## I.   BACKGROUND

Plaintiff Yolanda Mays filed a Complaint in this matter on May 14, 2024. (Dkt. 1.) The original Complaint also named Tommy Holmes as a Plaintiff. (*Id.*) On March 8, 2025, Plaintiffs filed an Amended Complaint (Dkt. 27) pursuant to the parties' stipulation (Dkt. 24.) The parties stipulated to amend the Amended Complaint after Mr. Holmes passed away on May 18, 2025. (Dkt. 51 at 1.) The Second Amended Complaint substituted Yolanda Mays as trustee for the heirs and next of kin of Tommy Holmes for

1

Plaintiff Tommy Holmes and is the operative complaint in this matter.  (Dkt. 54.)  As of the date of this Order, Mays is named as the sole Plaintiff in her capacities as an individual and trustee.  (*See id.*)

The operative Second Amended Complaint contains the following allegations.  On March 21, 2023, officers of the Minneapolis Police Department ("MPD") approached Plaintiff's home.  (*Id.* ¶ 11.)  After knocking on the door and receiving no response, the MPD officers looked through Plaintiff's mail and peered into a window.  (*Id.* ¶¶ 15-21.)  The officers observed a baby doll on the couch.  (*Id.* ¶ 22.)  "Any reasonable observer would have been able to understand that it was a baby doll on the couch, not an actual infant.  Such distinguishing features included that the doll was made of plastic, that the doll had a seam on its chest, that its body was made of fabric, and that its hand was curved and rigid in an unnatural manner."  (*Id.* ¶ 25.)  The MPD officers then called for assistance from the Brooklyn Center Police Department ("BCPD").  (*Id.* ¶ 28.)  Several BCPD officers, including Defendant Douglas Salvosa, responded to the call.  (*Id.* ¶ 32.)  The MPD officers informed the BCPD officers that they had been looking for ten minutes but were uncertain whether it was a baby doll or a dead infant on the couch, and Salvosa heard those comments.  (*Id.* ¶¶ 29-30, 34.)  After looking through the window, Salvosa "disregarded further efforts to investigate the situation from the exterior" and "forcibly kicked the door of the Residence in."  (*Id.* ¶ 35.)  "Salvosa knew that officers could enter the home without damage to the property by using the garage code and access key."  (*Id.* ¶ 41.)  "Officers immediately acknowledged that the figure on the couch was a doll when they made entry.  It was obvious to officers that it was a baby doll and not an actual

2

infant." (*Id.* ¶ 47.)  However, the officers proceeded to search the entire home.  (*Id.* ¶ 49.)  Tommy Holmes had been resting in his bedroom at the time.  (*Id.* ¶ 53.)  "The officers' forced entry scared Holmes at the time.  He thought that attackers or intruders were making entry into the home."  (*Id.* ¶ 55.)  The Second Amended Complaint alleges that Defendants' actions violated Plaintiff and Holmes' Fourth and Fourteenth Amendment rights.  (*Id.* ¶ 76.)

On March 22, 2023, the day after the incident, Plaintiff submitted a complaint about the officers' conduct, reporting that the officers kicked in her door and searched her home and garage without a warrant.  (Dkt. 44-4 at 2-3.)[1]  Sergeant Brandon Zabel, who was Salvosa's direct supervisor and had also been present for the incident, was asked to investigate Plaintiff's complaint.  (Dkt. 44-5; Dkt. 65-1 at 41:18.)[2]  As a part of his investigation, Zabel reviewed the footage from Salvosa's body worn camera ("BWC").  (Dkt. 44-5.)  Salvosa had categorized his BWC footage as "Assist Other Agency," which resulted in a 90-day retention period.  (Dkt. 58 ¶ 4.)  Zabel did not recategorize the footage from Salvosa or any other responding BCPD officer's BWCs.  (*Id.* ¶ 6.)  However, Zabel categorized his own BWC footage in a manner which resulted in a longer retention period.  (Dkt. 65-1 at 14:20-16:19.)  Zabel had muted his body camera during the incident, such that his BWC stopped recording audio and only recorded video once it was muted.  (*Id.* at 37:13-39:10.)

---

[1]     Unless otherwise indicated, page number citations are to the CM/ECF pagination.

[2]     Transcripts are cited in page:line format.

Following his investigation, Zabel concluded that "there was no evidence of a policy violation or misconduct on the part of either Brooklyn Center or Minneapolis Officers." (Dkt. 58 ¶ 6.) Zabel stated in his report that he had reached out to Plaintiff, who had "clarified that she was only upset that officers broke down her door" and "made no other indication of officer misconduct." (Dkt. 44-5 at 3.) Plaintiff contests this claim and asserts that she "brought the complaint due to the violation of [her] rights and invasion of privacy, in addition to the damage to [her] door" and that she "never limited [her] complaint or told any officers that [she] no longer wanted to pursue any part of it." (Dkt. 64 ¶¶ 4, 6.)

Zabel informed Plaintiff of the results of his investigation in a letter dated April 8, 2023. (Dkt. 37-1 at 1.) The City of Brooklyn Center ("the City") subsequently reimbursed Plaintiff for the cost of repairing her door. (Dkt. 44-7.)

On April 13, 2023, Plaintiff's prior counsel submitted a data request[3] to the City for "all incident reports and supplements, body-worn camera data, Visi-net logs, and other mobile data terminal traffic" regarding the incident. (Dkt. 37-2 at 1.) The City did not respond to this request. (*Id.*)

On June 19, 2023, the 90-day retention period resulting from Salvosa's categorization of his BWC footage as "Assist Other Agency" would have elapsed, and the footage would have been automatically deleted. (Dkt. 44 ¶ 3.) Because the BCPD "is

---

[3]   The April 13, 2023 data request itself has not been filed with the Court. However, Plaintiff's September 28, 2023 demand letter, which was filed with the court, references the April 13, 2023 request. (Dkt. 37-2 at 1.) Salvosa has not disputed the fact that this request was made or that the City did not respond to the request.

no longer using the same bodyworn camera platform to store its videos that was utilized on March 21, 2023," no audit log is available to confirm whether the footage was in fact automatically deleted on that date.  (*Id.* ¶ 8.)

On September 28, 2023, Plaintiff's prior counsel sent a letter to the Brooklyn Center City Attorney's Office demanding damages and retraining of the involved officers.  (Dkt. 37-2 at 2.)

On May 14, 2024, Plaintiff filed this lawsuit.  (Dkt. 1.)  During Salvosa's deposition on February 6, 2025, Plaintiff learned that Salvosa's BWC had been activated during the incident.  (Dkt. 45-1 at 23:7-24:3; Dkt. 65-3 at 1.)  In an email following the deposition, Plaintiff's counsel asked counsel for Salvosa why Salvosa's BWC footage had not been produced.  (Dkt. 65-3 at 1.)  Counsel for Salvosa responded that, given the retention schedule and the categorization of Salvosa's footage, the footage would have already "dropped off" the server by the time Plaintiff's counsel sent the demand letter on September 28, 2023.  (*Id.* at 2.)  Plaintiff's counsel responded by asking whether a "disciplinary complaint was filed and whether that would have caused the videos to be retained."  (*Id.*)  It is not clear from the record whether Plaintiff's counsel received a response to this email.

Plaintiff subsequently issued a subpoena to the City seeking documents related to the incident.  (Dkt. 37-3 at 1.)  The City's subpoena responses are signed by counsel of record for Salvosa.  (*See* Dkt. 37-3 at 3.)  The City did not produce any BWC footage from Salvosa.  However, in its subpoena responses dated September 23, 2025, it stated that "[t]he Brooklyn Center Police Department retains and preserves audio or video

recordings of a police incident in accordance with Minn. Stat. § 13.825." (Dkt. 37-3 at 2.)  The City also stated that there were no "documents related to or referencing any allegations of improper conduct or investigation of law enforcement officers' conduct during the Incident." (*Id.* at 1-2.)

On October 2, 2025, Plaintiff's counsel emailed Salvosa's counsel to meet and confer regarding Plaintiff's anticipated motion for sanctions. (Dkt. 65-4 at 1.)  In response, Salvosa's counsel maintained that "we do not have documentation that Ms. Mays made a formal Complaint against Officer Salvosa and didn't formally demand the videos until September 28, 2023 which would be outside of the 90 days retention period." (Dkt. 65-5 at 1.)

On October 3, 2025, Plaintiff brought the present Motion for Discovery Sanctions against Defendant Salvosa. (Dkt. 34.)  On October 8, 2025, the City supplemented its subpoena response to the request for "documents related to or referencing any allegations of improper conduct or investigation of law enforcement officers' conduct during the Incident" by producing records of Plaintiff's March 22, 2023 complaint and the resulting investigation. (Dkt. 65-6 at 1-2; Dkt. 44-4 at 2-3; Dkt. 44-5 at 2-10.)  This supplemental subpoena response was also signed by counsel of record for Salvosa. (Dkt. 65-6 at 3.)

Salvosa filed his opposition to the Motion on October 10, 2025. (Dkt. 42.)  The Court held a hearing on the Motion on November 5, 2025. (Dkt. 55.)  At the hearing, the Court ordered Salvosa to file a declaration by Zabel explaining his role in reviewing body camera footage, why he did not reclassify Salvosa's body camera footage, and why Zabel's body camera footage was preserved but the footage from the other Brooklyn

6

Center Officers on the scene was not. (*Id.*)  The Court also directed the parties to meet and confer as to what, if any, additional discovery would be conducted as a result of Zabel's declaration. (*Id.*)

Salvosa filed the Declaration of Branden Zabel on November 17, 2025, and Plaintiff deposed Zabel on December 8, 2025. (Dkts. 58, 65-1.)  On January 16, 2026, Plaintiff submitted a supplemental memorandum in support of her Motion for Discovery Sanctions. (Dkt. 63.)  On January 23, 2026, Salvosa submitted a supplemental memorandum in opposition to the Motion. (Dkt. 66.)  The Motion is now ripe for decision.

## II.   LEGAL STANDARDS

Rule 37(e) provides:

If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1)   upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2)   only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

   (A) presume that the lost information was unfavorable to the party;

   (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

   (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

Rule 37(e) "'does not apply when information is lost before a duty to preserve arises' 'in the anticipation or conduct of litigation.'" *N. Am. Sci. Assocs., LLC v. Conforti*, No. 24-CV-287 (JWB/ECW), 2024 WL 4903753, at *15 (D. Minn. Nov. 27, 2024) (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). Courts in this District have held that "the obligation to preserve evidence begins when a party knows or should have known that the evidence is relevant to future or current litigation." *Id.* at *16 (quoting *The Valspar Corp. v. Millennium Inorganic Chems., Inc.*, No. 13-CV-3214(ADM/LIB), 2016 WL 6902459, at *4 (D. Minn. Jan. 20, 2016)). The "duty to preserve relevant evidence must be viewed from the perspective of the party with control of the evidence." *Great Am. Ins. Co. v. Twin Cities Dance & Ent. Co., LLC*, No. 23-CV-767 (NEB/SGE), 2025 WL 1754485, at *3 (D. Minn. Mar. 5, 2025) (quoting *Rao v. St. Jude Med. S.C., Inc.*, 631 F. Supp. 3d 678, 711 (D. Minn. 2022)), *R. & R. adopted sub nom. Great Am. Ins. Co. v. Twin Cities Dance & Ent., LLC*, No. 23-CV-767 (NEB/SGE), 2025 WL 1772802 (D. Minn. June 27, 2025).

A defendant's duty to preserve evidence is often triggered at the time that a case is filed, but the duty may be triggered prior to litigation if the defendant "becomes aware of facts from which it should reasonably know that evidence is to be preserved as relevant to future litigation." *Valspar*, 2016 WL 6902459, at *4 (collecting cases). "A variety of events may alert a party to the prospect of litigation." Fed. R. Civ. P. 37(e), advisory committee's note to 2015 amendment. In some cases, the incident giving rise to litigation itself can trigger the duty to preserve evidence. *Vogt v. MEnD Corr. Care, PLLC*, No. 21-CV-1055 (WMW/TNL), 2023 WL 2414551, at *8 (D. Minn. Jan. 30, 2023) ("The

Court concludes that the County had a duty to preserve the footage from Camera 18 immediately following Joshua Vogt's death."), *R. & R. adopted sub nom.* 2023 WL 2414531 (D. Minn. Mar. 8, 2023).

In considering whether a party had a duty to preserve ESI under Rule 37(e), courts may consider "whether there was an independent requirement that the lost information be preserved" such as "statutes, administrative regulations, an order in another case, or a party's own information-retention protocols." Fed. R. Civ. P. 37(e), advisory committee's note to 2015 amendment. However, "the fact that the party failed to observe some other preservation obligation does not itself prove that its efforts to preserve were not reasonable with respect to a particular case." *Id.*

Under Rule 37(e)(1), "Prejudice likely exists from lost or destroyed ESI if the lost or missing evidence would be different or more helpful to the party claiming spoliation than the evidence already in existence, but prejudice does not exist when there is no support for the speculation that the lost evidence would have affected the litigation." *Sandoval v. Dustar Express, Inc.*, No. 24-CV-02601 (SRN/SGE), 2026 WL 880396, at *11 (D. Minn. Mar. 31, 2026) (citation modified). Destroyed evidence need not constitute a "smoking-gun" for prejudice to exist. *See Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 748 (8th Cir. 2004). In some cases, prejudice can be satisfied by the nature of the evidence itself. *Id.*

"[U]pon finding prejudice to another party from loss of the information," the Court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Such measures may include:

forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument, other than instructions to which subdivision (e)(2) applies. Care must be taken, however, to ensure that curative measures under subdivision (e)(1) do not have the effect of measures that are permitted under subdivision (e)(2).

*Id.*

Rule 37(e)(2), on the other hand, "does not include a requirement that the court find prejudice to the party deprived of the information" "because the finding of intent required by the subdivision can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position." Fed. R. Civ. P. 37(e)(2) advisory committee's note to 2015 amendment.

A spoliation sanction pursuant to Rule 37(e)(2) requires a "finding that the party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). Because this intent "rarely is proved by direct evidence, . . . a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors." *Vogt*, 2023 WL 2414551, at *9 (quoting *Morris v. Union Pac. R.R.,* 373 F.3d 896, 901 (8th Cir. 2004)).

Sanctions in the form of an adverse inference instruction or entry of default judgment are extreme and should not be given lightly. *Rao v. St. Jude Med. S.C., Inc.*, 631 F. Supp. 3d 678, 712 (D. Minn. 2022) (quoting *Zubulake v. UBS Warburg LLC*, 220

10

F.R.D. 212, 219-20 (S.D.N.Y. 2003)).  The advisory committee's note to the 2015

amendment to Rule 37(e)(2) states:

> Courts should exercise caution, however, in using the measures specified in (e)(2). Finding an intent to deprive another party of the lost information's use in the litigation does not require a court to adopt any of the measures listed in subdivision (e)(2). The remedy should fit the wrong, and the severe measures authorized by this subdivision should not be used when the information lost was relatively unimportant or lesser measures such as those specified in subdivision (e)(1) would be sufficient to redress the loss.

Fed. R. Civ. P. 37(e)(2) advisory committee's note to 2015 amendment.

### III.    ANALYSIS

Before the Court can analyze whether sanctions are warranted in this case, it must

first determine whose conduct is at issue in this motion.  Plaintiff brought this motion

against Salvosa.  (Dkt. 34.)  Neither Zabel, the City, nor the BCPD are parties to this

lawsuit.  The Court begins its analysis by considering whether the actions of these

nonparties can be imputed to Salvosa for purposes of this motion.

### A.    Imputation

Plaintiff cites *Vogt v. MEnD Correctional Care* for the proposition that the special

relationship between law enforcement employees and a municipality in Section 1983

lawsuits permits imputation of discovery violations to individual defendants even when

the municipality itself is primarily responsible for the lost evidence.  (Dkt. 36 at 4).  In

*Vogt*, the court concluded that a county's failure to preserve video footage related to an

inmate's death could be imputed to the correctional officers who were employees of the

county and defendants in the suit.  2023 WL 2414551, at *11-14.

11

In reaching this conclusion, the court considered *Burris v. Gulf Underwriters Insurance Co.*, in which the Eighth Circuit commented that an adverse inference would not be warranted against an insurer based on spoliation by its insured.[4] *Id.* at \*12 (citing *Burris v. Gulf Underwriters Ins. Co.*, 787 F.3d 875 (8th Cir. 2015)).  The court in *Vogt* noted that *Burris* was distinguishable because "the relationship between the alleged spoliator and the recipient of the sanctions was different."  *Id.* at \*13 (citing *Taylor v. Null*, No. 4:17-CV-0231-SPM, 2019 WL 4673426, at \*5 (E.D. Mo. Sept. 25, 2019)).  The *Vogt* court noted that courts around the country have imputed spoliation by the state or its agencies to named officer defendants in § 1983 actions.  *Id.* at \*13 (collecting cases).  In those cases, "[t]he defense of the defendant officer-employees was also funded by the state and they would be indemnified from liability based on acts and omissions occurring within the scope of their employment."  *Id.*  Therefore, "any sanction against the defendant corrections officer will be in many important respects a sanction felt most acutely by the [state agency]."  *Id.* (citation modified).

Further, the *Vogt* court reasoned that declining to impute an agency's spoliation to an individual defendant "would present a dilemma in the context of prison litigation . . . where the responsibility for preserving evidence may be spread out among multiple officials within an institution."  *Id.* at \*14 (quoting *Muhammad v. Mathena*, No.

---

[4]    As another court commenting on *Burris* noted, this conclusion may be dicta, as the Eighth Circuit had already concluded that the evidence was insufficient to establish that the insured had the required intent.  *See Taylor v. Null*, No. 4:17-CV-0231-SPM, 2019 WL 4673426, at \*5 (E.D. Mo. Sept. 25, 2019).

7:14CV00529, 2016 WL 8116155, at *7 (W.D. Va. Dec. 12, 2016), *R. & R. adopted sub nom.*, 2017 WL 395225 (W.D. Va. Jan. 27, 2017)).  Likewise,

> "refusal to recognize a special relationship would lead to the absurd result that a state-run correctional facility could wrongly destroy any piece of evidence in its control with near-zero risk of consequence in prisoner suits," and "would encourage barriers to accountability for failure to preserve material evidence and undermine the integrity of the judicial process that depends on the adversarial presentation of evidence in order to uncover the truth."

*Id.* (quoting *Johns v. Gwinn*, 503 F. Supp. 3d 452, 464-65 (W.D. Va. 2020)).

The *Vogt* court, however, did not endorse a bright line rule that an agency's spoliation should always be imputed to its officers, and concluded that "[t]he more prudent path is to consider instances raising spoliation questions on a case-by-case basis." *Id.* (quoting *Stanbro v. Westchester Cnty. Health Care Corp.*, No. 19CIV10857 KMKJCM, 2021 WL 3863396, at *7 (S.D.N.Y. Aug. 27, 2021)).

Salvosa did not respond to Plaintiff's imputation argument in his brief.  At the hearing, the Court inquired as to Salvosa's position on imputation.  Counsel responded that this case is different from *Vogt* because BCPD did not have any reason to foresee litigation in this matter.  The Court understands this argument to go to whether BCPD committed spoliation, not whether any spoliation on BCPD's part can be imputed to Salvosa.

The Court concludes that imputation is appropriate in this case.  While there is no bright line rule that requires the Court to impute the City or the BCPD's conduct to Salvosa, the Court finds that *Vogt*'s reasoning is persuasive and its facts are apposite to this case.  Like in *Vogt*, Salvosa has a special relationship with the city and BCPD as its

13

employee. Salvosa's counsel represented at the hearing that she is paid by the City, and that "absent some miraculous circumstances," Salvosa would be indemnified if he were found individually liable. Salvosa's counsel also signed the City's subpoena responses in this matter. (*See* Dkt. 37-3 at 3; Dkt. 65-6 at 3.) The Court also finds that the concerns that *Vogt* raised regarding the diffusion of responsibility for preserving evidence within correctional agencies and the function of imputation to incentivize those agencies preserve evidence are applicable in the context of a police department. *See Stanbro v. Westchester Cnty. Health Care Corp.*, No. 19CIV10857KMKJCM, 2021 WL 3863396, at *6 (S.D.N.Y. Aug. 27, 2021) (considering imputation of spoliation in the police context). Accordingly, the Court does not limit its inquiry to Salvosa's actions alone and instead considers the conduct of the City and BCPD as a whole, including the conduct of its employee Zabel.

**B.    When the Duty to Preserve Arose**

The Court now turns to the question of when the duty to preserve Salvosa's BWC footage arose. The duty to preserve arises when a party knows or should have known that the evidence in question is relevant to future or current litigation. *N. Am. Sci. Assocs.*, 2024 WL 4903753, at *16. Plaintiff argues that the duty to preserve Salvosa's BWC footage arose at the time of the incident, because the "nature of the incident, property damage, and questionable justification for the intrusion should have alerted Brooklyn Center that litigation was likely due to the harm." (Dkt. 36 at 6.) Plaintiff argues that the complaint she submitted the following day also should have put the City on notice that litigation was likely. (*Id.*) Further, Plaintiff notes that both state law and

14

internal BCPD policies required footage to be preserved for at least one year when a complaint is filed about an officer. (*Id.* at 7.) Specifically, the Minnesota Government Data Practices Act ("MGDPA") requires that BWC footage be retained for at least one year if "a formal complaint is made against a peace officer related to the incident." Minn. Stat. § 13.825, subd. 3(b)(2). (*Id.*) The BCPD's internal policy sets an even longer retention period for this category of BWC footage, requiring a seven-year retention period when a formal complaint is filed against an officer. (Dkt. 37-4 at 4.) Finally, Plaintiff argues that her April 13, 2023 request for records "should have alerted Brooklyn Center that a potential claim was being investigated, which should have caused the materials to be preserved. (Dkt. 36 at 7.)

Salvosa first argues that the duty to preserve did not arise until Plaintiff initiated litigation on May 14, 2024. (Dkt. 42 at 13.) Salvosa also argues that "[w]hen a formal complaint is made against an individual officer, it would be the supervisor's responsibility to recategorize any body-worn camera footage as necessary, not the individual officer." (*Id.* at 5.) These arguments are unavailing given the Court's conclusion that the City and BCPD's conduct is imputed to Salvosa for purposes of this motion.

However, Salvosa later argued in his supplemental brief that even with respect to the City, the duty to preserve Salvosa's BWC footage "did not arise until it was formally requested by Plaintiff's attorney, Paul Bosman, which was after the 90-day retention period." (Dkt. 66 at 4.) Salvosa argues that the incident itself did not trigger a duty to preserve because it did not involve serious injury or death. (Dkt. 42 at 13.) The Court

15

agrees that the nature of the harm alleged in this case is different than in cases where courts have found the duty to preserve evidence to be immediately triggered by an event itself. *See Vogt*, 2023 WL 2414551, at *8 ("The Court concludes that the County had a duty to preserve the footage from Camera 18 immediately following Joshua Vogt's death.").

Salvosa also argues that the retention periods required by the MGDPA are irrelevant to BCPD's duty to preserve because a violation of the MGPDA "is fundamentally different than spoliation of evidence under federal law." (Dkt. 42 at 7-8.) It is true that the violation of a law or policy regarding document preservation does not by itself establish spoliation under Rule 37(e). Fed. R. Civ. P. 37(e), advisory committee's note to 2015 amendment. However, courts may consider "whether there was an independent requirement that the lost information be preserved" such as "statutes" or "a party's own information-retention protocols" in considering whether a party had a duty to preserve ESI under Rule 37(e). *Id.* Accordingly, the Court takes the MGPDA and BCPD's internal retention policy into account in analyzing whether the BCPD knew or should have known that litigation was likely as a result of Plaintiff's complaint.

The Court concludes that the duty to preserve arose no later than April 13, 2023, when Plaintiff's counsel submitted a data request to the City seeking, among other things, all BWC footage from the incident from the City. (*See* Dkt. 37-2 at 1.) This request, in combination with Plaintiff's March 22, 2023 formal complaint, should have put the City on notice that the footage was relevant to future litigation. This formal complaint alleged that officers kicked down her door and searched her home and garage without a warrant

16

(*see* Dkt. 44-4 at 2-3), which BCPD knew to be factually true, and BCPD and the City should have known that this conduct could give rise to a constitutional claim, even if it disagreed with the legal merits of that potential claim.  *See Taylor*, 2019 WL 4673426, at *6 (concluding that litigation was reasonably foreseeable despite defendants' contention that "no one at PCC or the MDOC could have foreseen that litigation was reasonably anticipated because, from their perspective after reviewing the video footage, there was no excessive use of force").

The fact that BCPD reimbursed Plaintiff for the cost of repairing her door did not eliminate the likelihood of litigation, as the formal complaint also raised the warrantless search of Plaintiff's home and garage.  (*See* Dkt. 44-4 at 2-3.)  The Court notes that in Zabel's memorandum documenting his investigation into Plaintiff's complaint, he stated that "I spoke with [Plaintiff] over the phone and she clarified that she was only upset that officers broke down her door."  (Dkt. 44-5 at 3.)  However, at his deposition, Zabel described this call somewhat differently, testifying that Plaintiff "was primarily concerned about the officers damaging her door" but when asked whether Plaintiff ever told him not to investigate or take further action regarding the warrantless searches, Zabel responded that "I don't recall her saying anything to that effect, no."  (Dkt. 65-1 at 42:23-43:14.)  Plaintiff has submitted an affidavit stating that "I never limited my complaint or told any officers that I no longer wanted to pursue any part of it."  (Dkt. 64 ¶ 4.)  The fact that Zabel may have understood Plaintiff to be more concerned about her door, when BCPD had not yet reimbursed Plaintiff for the door at the time, does not support a conclusion that Plaintiff withdrew her complaint regarding the warrantless searches.

But even assuming that Plaintiff's March 22, 2023 complaint was insufficient to trigger a duty to preserve BWC footage, the Court concludes that the April 13, 2023 data request that Plaintiff's counsel sent to the City for all BWC footage related to the incident should have alerted the City that the footage was relevant to future litigation. (*See* Dkt. 37-2 at 1.) This request was made by an attorney and concerned an incident about which Plaintiff had already filed a complaint. Courts have frequently found that "preservation letters" from attorneys trigger defendants' duty to preserve. *See Sandoval*, 2026 WL 880396, at *6 (collecting cases). The Court concludes that the same is true of Plaintiff's data request, which sought not only the preservation of the relevant footage, but its production to Plaintiff. The City is a sophisticated party and should have known that litigation was reasonably foreseeable when it learned that Plaintiff had retained an attorney to collect evidence regarding her complaint. *See* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment ("The court should be sensitive to the party's sophistication with regard to litigation in evaluating preservation efforts"). The April 13, 2023 data request was made more than two months prior to the footage's automatic deletion date of June 19, 2023. (*See* Dkt. 44 ¶ 3.) Salvosa did not address this request in his argument regarding when the duty to preserve was triggered. For all these reasons, the Court concludes that the duty to preserve was triggered before Salvosa's BWC footage was lost.

## C.     Reasonable Steps to Preserve the Evidence

The Court next considers whether reasonable steps were taken to preserve Salvosa's BWC footage. In doing so, the Court is "sensitive to the party's sophistication

18

with regard to litigation." *See* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Here, the City and the BCPD are sophisticated entities, and the Court expects that these entities are familiar with the preservation obligations associated with litigation. Salvosa has not identified any steps that he, the BCPD, or the City took to prevent his BWC footage from being deleted when the 90-day retention period expired. Accordingly, the Court finds that the footage was lost because the relevant parties failed to take reasonable steps to preserve it.

**D.     Whether the ESI can be Restored or Replaced through Additional Discovery**

Salvosa does not assert that his BWC footage can be restored, but he does argue that it has been replaced by additional discovery. (Dkt. 42 at 15.) Specifically, Salvosa notes that his actions prior to kicking down Plaintiff's door were captured on the BWC footage provided by the Minneapolis police officers on the scene, and that Plaintiff has had the opportunity to depose Salvosa. (*Id.*) Plaintiff responds that this other discovery does not replace what she may have learned from Salvosa's BWC footage. (Dkt. 36 at 8, Dkt. 63 at 6-7.) Plaintiff argues that the available BWC footage does not show Salvosa "at crucial moments" and that Salvosa's testimony is not a substitute for objective evidence of what happened. (Dkt. 36 at 8, Dkt. 63 at 6-7.)

The Court concludes that Salvosa's BWC footage cannot be restored or replaced through additional discovery. It is not just Salvosa's actions prior to kicking down the door that are at issue in this matter. The ensuing warrantless search of Plaintiff's home is at issue in this case, and the extent of Salvosa's participation in that search is not clear from the Minneapolis officers' footage. Further, after Salvosa's entry, his BWC footage

19

would have recorded any statements that he made about what had just occurred, which could be relevant to this case. Salvosa's BWC footage may also have captured relevant information before Salvosa came into view of the Minneapolis officers, including information that Salvosa may have received from dispatch.

Even to the extent that Salvosa did appear in the footage from other officers' BWCs, that footage does not replace the perspective from his BWC, because (as discussed below) what Salvosa personally heard and saw is at issue in this case. *See infra* Section III.F.

Finally, the Court agrees with Plaintiff that Salvosa's testimony is not a replacement for his BWC footage. Salvosa's deposition took place on February 6, 2025, nearly two years after the events giving rise to this lawsuit. (Dkt. 45-1 at 2.) Salvosa testified that he did not recall certain information which his BWC footage may have recorded, including what the Minneapolis officers told him when he arrived on the scene and whether he went into any other rooms in Plaintiff's home after finding the doll. (*Id.* at 21:16-20; 91:17-20.) Even if Salvosa did remember the answer to every question, the Court is not persuaded that a defendant's testimony is an adequate replacement for objective evidence that could either verify or impeach such testimony. Accordingly, the Court concludes that Salvosa's BWC footage cannot be replaced by additional discovery.

Having concluded that Salvosa's BWC footage should have been preserved in anticipation of litigation, the footage was lost because the responsible parties did not take reasonable steps to preserve it, and the footage cannot be restored or replaced through additional discovery, sanctions may be warranted if the criteria of Rule 37(e)(1) or

20

37(e)(2) are met.  The Court begins by considering the more extreme sanctions available under Rule 37(e)(2).

**E.     Rule 37(e)(2) Sanctions**

The Court next considers whether the footage was destroyed with the intent required to impose a sanction under Rule 37(e)(2).  A spoliation sanction pursuant to Rule 37(e)(2) requires a "finding that the party acted with the intent to deprive another party of the information's use in the litigation."  Fed. R. Civ. P. 37(e)(2).  Because this intent "rarely is proved by direct evidence, . . . a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors."  *Vogt*, 2023 WL 2414551, at *9 (quoting *Morris,* 373 F.3d at 902).

In some cases, courts have found the selective preservation of evidence to support this finding of intentional destruction.  *See Vogt*, 2023 WL 2414551, at *9; *Stevenson*, 354 F.3d at 748.  In *Vogt*, the court found the intent required to impose a spoliation sanction under Rule 37(e)(2) where jail officials preserved footage from several cameras in an area where a prisoner died, but did not preserve footage from a third camera, which may have included more information about the events leading up to the prisoner's death. *Vogt*, 2023 WL 2414551, at *9.  The fact that the missing footage was overwritten by automatic procedures, rather than being affirmatively deleted, did not prevent a finding of intentional destruction.  *Id.*  Rather, the court found the required intent because the responsible parties knew that the footage "would be relevant to the ensuing investigation and any potential litigation arising therefrom"; because there was no explanation,

"credible or otherwise," for why the missing footage was not retained and other footage was; and because the responsible parties were aware of the footage at a time when it could have been saved. *Id.*

The *Vogt* court relied in part on *Stevenson*, in which the Eighth Circuit affirmed the district court's adverse inference instruction arising out of the destruction of evidence. 354 F.3d at 748. In that case, the defendant railroad had failed to preserve an audio recording related to a train accident. *Id.* at 746-48. The Eighth Circuit noted that the railroad should have known that the recording was relevant to future litigation, and that "the record indicates that Union Pacific made an immediate effort to preserve other types of evidence but not the voice tape, and the district court noted that Union Pacific was careful to preserve a voice tape in other cases where the tape proved to be beneficial to Union Pacific." *Id.* at 748. The Eighth Circuit concluded that:

> The prelitigation destruction of the voice tape in this combination of circumstances, though done pursuant to a routine retention policy, creates a sufficiently strong inference of an intent to destroy it for the purpose of suppressing evidence of the facts surrounding the operation of the train at the time of the accident.

*Id.* While *Stevenson* predates the adoption of Rule 37(e), the Court concludes that this holding remains applicable in this context because the standard it applied to the question of intent is consistent with the standard later set in Rule 37(e). *Compare id.* at 746 ("there must be a finding of intentional destruction indicating a desire to suppress the truth"), *with* Fed. R. Civ. P. 37(e)(2) (requiring a "finding that the party acted with the intent to deprive another party of the information's use in the litigation"); *see also Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226, 235 (D. Minn. 2019) ("In fact, in cases that

22

predate Rule 37(e) in its current form, courts had concluded that the failure to preserve some types of ESI while destroying others is a reasonable basis to infer that the destroying party acted with bad faith." (citing *Stevenson*)).

Courts in other jurisdictions have reached the same conclusion based on the selective preservation of evidence. *See Culhane v. Wal-Mart Supercenter*, 364 F. Supp. 3d 768, 774 (E.D. Mich. 2019) (inferring intent to deprive when a party "selectively preserved" some video footage while allowing other footage to be overwritten); *Est. of Hill by & through Grube v. NaphCare, Inc.*, No. 2:20-CV-00410-MKD, 2022 WL 1464830, at *13 (E.D. Wash. May 9, 2022) (inferring intent when "an intentional decision was made to preserve some portions of the relevant jail video but not others" without "a credible explanation for why the most relevant video was the portion to be permanently destroyed").

Here, there is no dispute that some but not all of the BCPD BWC footage from this incident was preserved. The Court thus considers whether there is a credible explanation for this inconsistency. Salvosa asserts that it was Zabel's responsibility to ensure that both Salvosa and his own BWC footage were categorized correctly following Plaintiff's complaint. (*See* Dkt. 42 at 5.) At the November 5, 2025 hearing, the Court ordered Salvosa to file a declaration from Zabel explaining "Zabel's role in reviewing body camera footage, why he did not reclassify Salvosa's body camera footage, and why Zabel's body camera footage was preserved but the footage from the other [] Brooklyn Center Officers on the scene was not." (Dkt. 55 at 1.) On November 17, 2025, Salvosa filed a Declaration of Brandon Zabel. (Dkt. 58.) Zabel stated in his declaration that "I

categorized my body-worn camera footage from March 21, 2023, as Arrest or Report[5] because I was called to the scene to review and report on the damage to property." (*Id.* ¶ 3.) Zabel also stated that "It was appropriate for Officer Salvosa to categorize his body-worn camera video as [Assist Other Agency] because he was originally called to the scene to assist Minneapolis Police Officers." (*Id.* ¶ 5.) Zabel stated that he "investigated a complaint regarding an incident that occurred on March 21, 2023, submitted by Yolanda Mays" and that he "did not recategorize Officer Salvosa or other responding Brooklyn Center officers' body-worn camera footage." (*Id.* ¶ 6.) Although the Court ordered Zabel to explain "why he did not reclassify Salvosa's body camera footage, and why Zabel's body camera footage was preserved but the footage from the other [] Brooklyn Center Officers on the scene was not" (Dkt. 55 at 1), Zabel's declaration offered no explanation as to why he did not reclassify Salvosa's footage following Plaintiff's complaint. He also did not state whether the categorization of Salvosa's footage remained appropriate following Plaintiff's complaint.

Plaintiff deposed Zabel on December 8, 2025. (Dkt. 65-1 at 1.) When asked why he did not categorize his own BWC footage as Assist Other Agency, Zabel testified that:

> My assessment of the way the call was resolved. Like I said, I knew it was go- -- I knew it was going to be resulting in a report because we went on scene and it was more than just a "we showed up and left." We actually took action and caused damage. So I knew there was going to be a report. We pulled the case number for it. So my assessment of the way I needed to

---

[5]   Zabel later testified at his deposition that "Arrest or Report" is the terminology used in the current recording system, not the recording system that was in use at the time of the incident. (Dkt. 65-1 at 15:1-12.) He testified that, as far as he could recall, "Arrest or Report" was the closest categorization to the categorization he would have used under the prior system. (*Id.*)

24

categorize my video was as an Arrest or Report, at -- at least using the -- the current tech- --terminology.  It may have been something similar, like I said, back then.

(*Id.* at 16:8-19.)  However, when asked whether it would have been appropriate to

categorize his footage as "Assist Other Agency," Zabel responded:

It could have been.  But it -- it -- at the time, it -- it almost seemed like a distinction without a difference because we were actually called there initially for an assist to another agency. In this case we also did, you know, resolve the case -- or, sorry, the call with a report. So it -- honestly, I could've -- it would -- I could have just as easily assigned it as Assist Other Agency, given my specific involvement.

(*Id.* at 16:23-17:6.)  When asked about the different retention periods associated with each

category, Zabel responded:

Honestly, I wouldn't have assumed that there would have been a significant departure from Assist Other Agency to Arrest or Report. I think, obviously, having looked at the retention schedule for each item, you would go, "Oh, that's" – "there's a" – "there's a significant difference." But when -- at the time -- and, again, this is in hindsight. I -- I would not have assumed that there would have been a significant difference in retention period between Arrest or Report and Assist Other Agency.

(*Id.* at 17:18-18:5.)  However, when asked to clarify whether he personally knew "about

any difference in retention or treatment between Assist Other Agency and Arrest or

Report at the time of the Mays incident," Zabel responded:

I -- I didn't make my decision based off of how long I thought the video would be retained.  I made my decision based off of what was more closely how I perceived the call to be resolved.  In this case, with a report.

(*Id.* at 18:12-16.)  When asked whether he was expected to reclassify videos associated

with a complaint that he reviewed, Zabel responded:

25

Only if it was obviously incorrectly categorized. But given the nature of why we were there and the fact that I had resolved the complaint, at least as I perceived it, I saw no need to change a -- the classification for the video.

(*Id.* at 44:4-8.)  When asked whether it had been his understanding that he had a responsibility to reclassify Salvosa's footage in response to Plaintiff's complaint, Zabel responded, "No.  Because as I said, the classification of Assist Other Agency would have been considered appropriate given the fact that we were there to assist another agency." (Dkt. 65-1 at 45:2-5.)  Zabel testified that he did not recall the City ever providing any training, policies, or guidance about record retention related to complaint investigation. (*Id.* at 44: 9-12.)

Plaintiff argues that "Sgt. Zabel's testimony contradicts Brooklyn Center's claim that its policies complied with Minnesota data laws and preserved recordings associated with a complaint for at least a year" and that "because Brooklyn Center has failed to provide a credible and consistent explanation that would justify the deletion, this Court should find that the recordings were deleted with intent to deprive Plaintiff of the opportunity to use them in litigation."  (Dkt. 63 at 6, 10.)

As an initial matter, the Court is troubled by Zabel's apparent lack of knowledge regarding the BCPD's obligations under the MGDPA.  *See* Minn. Stat. § 13.825, subd. 3(b)(2) (requiring BWC footage to be retained for at least one year if a formal complaint is made against an officer related to the incident).  To the extent that the City and the BCPD have endorsed Zabel's conduct in not reclassifying the footage to meet the minimum requirements of state law, the Court is equally concerned.  Zabel testified that he did not recall whether "Brooklyn Center ever provide[d] any training, policies, or

26

guidance about record retention related to complaint investigation." (Dkt. 65-1 at 44:9-12.)  If it is the case that the City never actually provided any such training, policies, or guidance to officers like Zabel, the absence of such training, policies, or guidance would be very concerning.  It would also be concerning that a supervisor in the BCPD is apparently unaware of or does not recall any such training, policies, or guidance.  However, the question before the Court is not whether the deletion of the BWC footage was justified or violated state law, City policies, or BCPD policies.[6]  At this point in its analysis, the Court must consider whether there is a credible explanation for the selective retention of evidence other than an intent to deprive another party of the information's use in the litigation.  *See* Fed. R. Civ. P. 37(e)(2).

The Court concludes that it cannot infer the requisite intent to deprive under these circumstances.  This case is distinguishable from the selective preservation cases discussed above because the record does not support an inference that Zabel intended for his own footage to be preserved for litigation purposes.  He did not preserve his footage in an indefinite litigation hold or send his footage to an attorney.  While he categorized his footage in a way that resulted in a longer retention period than Salvosa's, his footage

---

[6]   The Court is also concerned that City initially claimed on September 23, 2025 in response to Plaintiff's subpoena that there were no "documents related to or referencing any allegations of improper conduct or investigation of law enforcement officers' conduct during the Incident" (Dkt. 37-3 at 1-2) and only supplemented its response on October 8, 2025, after Plaintiff filed this Motion, to produce records of Plaintiff's March 22, 2023 complaint and the resulting investigation (Dkt. 65-6 at 1-2; Dkt. 44-4 at 2-3; Dkt. 44-5 at 2-10).

was also set to be automatically deleted at the end of that period.[7]  In contrast, the footage that was selectively preserved in *Vogt* was forwarded to the County Attorney, presumably for use in litigation.  2023 WL 2414551, at *6.  Similarly in *Stevenson*, "the district court found that Union Pacific had been involved in many grade crossing collisions and knew that the taped conversations would be relevant in any potential litigation regarding an accident that resulted in death and serious injury" and "the record indicate[d] that Union Pacific made an immediate effort to preserve other types of evidence but not the voice tape, and the district court noted that Union Pacific was careful to preserve a voice tape in other cases where the tape proved to be beneficial to Union Pacific."  354 F.3d at 747-48. Here, there is no evidence that Zabel anticipated litigation at the time when he investigated the complaint and could have recategorized the relevant footage.

Zabel testified that, at the time, the categorization of his footage as "Arrest or Report" and Salvosa's as "Assist Other Agency" seemed like "a distinction without a difference" and that either could have been correct.  (Dkt. 65-1 at 16:20-17:6.)  He testified that he "would not have assumed that there would have been a significant difference in retention period between Arrest or Report and Assist Other Agency" and that he "didn't make [his] decision based off of how long I thought the video would be retained."  (*Id.* at 18:2-13.)  While Zabel's reasoning that both categorizations could be correct may not be entirely sound, and his testimony regarding retention requirements

---

[7]    It is not clear from the record exactly when Zabel's footage would have been deleted because he did not remember the specific categorization he applied, and because there is no audit log available.  (Dkt. 65-1 at 15:1-12; Dkt. 44 ¶ 8.)

and related training (or lack thereof) is concerning, the Court does not find that his explanation lacks credibility.  The Court may have reached a different conclusion had Plaintiff put forward evidence that Zabel had been trained as to retention policies and the requirements of the MGDPA or had applied the retention policy correctly in other cases.  But on the record before it, the Court cannot rule out the possibility that the inconsistent retention in this case was ignorance, confusion, or misunderstanding of the applicable policies rather than the intentional destruction of evidence for the purpose of depriving another party of the information's use in this litigation.[8]

Plaintiff argues that even if we accept Zabel's explanation, it would mean that "Brooklyn Center intentionally condoned a system that allowed the improper premature deletion of recordings associated with a disciplinary investigation.  These circumstances are also sufficient to find intentional destruction of the recordings."  (Dkt. 63 at 9.)  However, negligence or even gross negligence is insufficient to support an award of sanctions under Rule 37(e)(2).  Fed. R. Civ. P. 37(e)(2) advisory committee's note to 2015 amendment ("[Rule 37(e)(2)] rejects cases such as *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002), that authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence.").  While the facts of this case give the Court serious concerns about the City's retention systems, polices, and training, the record does not support a finding that the City's actions or inaction rose above the level of gross negligence to establish the specific intent to deprive

---

[8]    To be clear, the Court does not condone any such ignorance, confusion, or misunderstanding of the applicable policies.

another party of the use of Salvosa's BWC footage in this litigation.  Accordingly, the Court concludes that sanctions under Rule 37(e)(2) are not warranted in this case.

**F.      Rule 37(e)(1) Sanctions**

The Court next considers whether any sanction is warranted under Rule 37(e)(1). Under this rule, "upon finding prejudice to another party from loss of the information, [the Court] may order measures no greater than necessary to cure the prejudice."  Fed. R. Civ. P. 37(e)(1).  "Prejudice likely exists from lost or destroyed ESI if the lost or missing evidence would be different or more helpful to the party claiming spoliation than the evidence already in existence, but prejudice does not exist when there is no support for the speculation that the lost evidence would have affected the litigation."  *Sandoval*, 2026 WL 880396, at *11 (citation modified).

Plaintiff argues that the loss of Salvosa's BWC footage prejudiced her.  (Dkt. 36 at 10-11).  Specifically, Plaintiff argues that there are disputes about what Salvosa knew before forcing entry, including whether he knew the Minneapolis officers had been on site for ten minutes before he arrived and whether he knew about a garage code and key available to law enforcement that would have provided a means to enter Plaintiff's home without damaging her door.  (*Id.*)  Plaintiff argues that "[w]ithout the recording, Salvosa can make claims that support his position without being rebutted by an objective recording of what he saw, heard, and did" and that "[b]ecause the Plaintiffs have lost evidence that could have rebutted Salvosa's claims, they are effectively unable to challenge Salvosa's contentions that are not captured on other officers' recordings."  (*Id.* at 11.)  Plaintiff cites *Vogt* for the proposition that "[l]ost evidence that would have

helped evaluate credibility of conflicting statements or would have provided a different perspective of an incident can cause prejudice." (*Id.* at 10 (citing *Vogt*, 2023 WL 2414551, at \*11).)

Salvosa responds that "[b]ody-worn camera footage of the Brooklyn Center Police officers on the day of the incident would be relevant, but it is purely speculative that video would have materially benefitted Plaintiffs' case and frankly would likely be more helpful for Defendants in pursuing dismissal of Plaintiffs' claims." (Dkt. 42 at 17-18.) While Salvosa maintains that he did not have knowledge of the garage code, he also argues that such knowledge would not affect Plaintiff's claims, because Plaintiff had only given the City permission to use the code as necessary to enter her home to render medical aid to her uncle, Mr. Holmes, and because this lawsuit encompasses more than the damage to Plaintiff's door, for which the city has already compensated Plaintiff. (Dkt. 66 at 6.) This argument is compelling. It is unclear to the Court how Salvosa's knowledge of the door code would impact Plaintiff's case.

However, the Court finds Salvosa's knowledge of the length of time that had passed since the Minneapolis officers first observed what turned out to be a doll to be highly relevant to this case. Salvosa has taken the position that he "had not known how long the Minneapolis officers had been on the scene at this time nor had he known how long it had been since they had first observed the doll on the couch." (Dkt. 71 at 4.) At his deposition, Salvosa was asked: "Would it have mattered to your conduct if the Minneapolis officers had observed this figure for more than ten minutes at this point?" (Dkt. 45-1 at 46:8-10.) Salvosa responded that it would, and explained that:

31

> There probably would have been less of an emergency, an exigent emergency. If they had been there for ten minutes, I mean, at some point statistically the need to do any life saving goes down and the hesitation kind of makes it less of an emergency in my mind. It's not an immediate emergency anymore if we're kind of debating.

(*Id.* at 46:13-19.) However, there is reason to doubt Salvosa's assertion that he did not know how long the Minneapolis officers had been observing what turned out to be a doll.

A video from a Minneapolis officer shows another Minneapolis officer stating that they had been looking at the doll for ten minutes. (Dkt. 45-4 at 11:03-06.) Salvosa asserts that he did not hear this statement, and that his own BWC footage would not benefit Plaintiff's case on this point because "[i]n the bodyworn camera footage provided by the City of Minneapolis, one can hear what the Minneapolis officers relayed to Officer Salvosa when he arrived, whether he heard it or not would not be captured by his own body-worn camera footage." (Dkt. 42 at 17.) It is true that the fact that a statement was picked up on Salvosa's BWC would not definitively prove that he heard the statement. However, the Court finds that Salvosa's footage would have been more helpful than the existing footage in assessing his claim that he did not hear the statement, as the Minneapolis officer's view of Salvosa is obstructed at the time the statement was made, and it is unclear how, if at all, Salvosa reacted to the statement. (*See* Dkt. 45-4 at 11:03-06.) Further, the relative volume of the statement in question compared to statements that Salvosa did hear could be helpful in assessing Salvosa's claim about what he heard.

Moreover, Salvosa's conduct and statements following his entry into Plaintiff's house may have been probative as to his state of mind at the time of entry. The available video footage shows that after Salvosa kicked down Plaintiff's door, the officers on site

32

continued to discuss what had just transpired.  (*See generally* Dkts. 45-3, 45-4, & 50-3.)

Salvosa is recorded in some but not all of this footage.  The Court finds that it is

reasonably likely that Salvosa may have debriefed what he knew at the time of entry with

his colleagues in conversations that took place at the scene of the incident but were not

recorded.  Such footage would have been "different or more helpful" than the evidence

already in existence.  *See Sandoval*, 2026 WL 880396, at *11.  Accordingly, the Court

concludes that Plaintiff is prejudiced by the loss of Salvosa's BWC footage.

## G.      The Appropriate Sanction

Upon a finding of prejudice pursuant to Rule 37(e)(1), the Court "may order

measures no greater than necessary to cure the prejudice."  Fed. R. Civ. P. 37(e)(1).  "The

range of such measures is quite broad if they are necessary for this purpose. . . . But

authority to order measures no greater than necessary to cure prejudice does not require

the court to adopt measures to cure every possible prejudicial effect."  Fed. R. Civ. P.

37(e)(1), advisory committee's note to 2015 amendment.

> In an appropriate case, it may be that serious measures are necessary to cure prejudice found by the court, such as forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument, other than instructions to which subdivision (e)(2) applies. **Care must be taken, however, to ensure that curative measures under subdivision (e)(1) do not have the effect of measures that are permitted under subdivision (e)(2) only on a finding of intent to deprive another party of the lost information's use in the litigation.**

*Id.* (emphasis added).  Further, "[m]any courts have imposed monetary sanctions under

Rule 37(e)(1).  *Sandoval*, 2026 WL 880396, at *12; *see also Vogt*, 2023 WL 2414551, at

*17 ("In addition to any other sanctions expressly contemplated by Rule 37(e), as amended, a court has discretion to award attorneys' fees and costs to the moving party, to the extent reasonable to address any prejudice caused by the spoliation.").

Here, Plaintiff has not sought any evidentiary sanction that would be permissible under Rule 37(e)(1).  However, Plaintiff has sought her attorney's fees associated with investigating and responding to the spoliation of Salvosa's BWC footage.  (Dkt. 36 at 12.)  Salvosa relies on *Stevenson* to argue that fees are not appropriate in this case.  (Dkt. 42 at 21.)  In *Stevenson*, the Eighth Circuit explained that

> Federal courts sitting in diversity can use their inherent power to assess attorney fees as a sanction for bad faith conduct even if the applicable state law does not recognize the bad faith exception to the general rule against fee shifting. This inherent power reaches conduct both before and during litigation as long as that conduct abuses the judicial process in some manner. A bad faith finding is specifically required in order to assess attorneys' fees.

554 F.3d at 751 (citation modified).

*Stevenson* is inapposite for several reasons.  First, the Court is not sitting in diversity in this case and is not relying on its inherent authority.  Rather, the Court is considering attorneys' fees as a sanction pursuant to Rule 37(e)(1).  As discussed in Section III.E of this order, *Stevenson* predates the adoption of Rule 37(e)(1).  While the Court found that *Stevenson*'s holding with respect to intent remained apposite to this case because it is consistent with the intent required by Rule 37(e)(2), the same cannot be said about *Stevenson's* holding with respect to fees.  Rule 37(e)(1) authorizes courts to impose a broad range of sanctions to the extent they are necessary to cure the prejudice caused by spoliation.  *See* Fed. R. Civ. P. 37(e)(1), advisory committee's note to 2015 amendment.

Courts interpreting this rule have found that attorneys fees can be one such sanction under 37(e)(1), which does not require any finding of bad faith or intent to deprive. *E.g.*, *Sandoval*, 2026 WL 880396, at \*12; *Spencer v. Lunada Bay Boys*, No. 16-CV-2129, 2018 WL 839862, \*1 (C.D. Calif. Feb. 12, 2018) (noting that "[t]here is no requirement in Rule 37(e) or the Committee Notes that a court must make a finding of bad faith before imposing monetary sanctions, and district courts have imposed monetary sanctions" and collecting cases). The Court concludes that no showing of bad faith is required to award attorneys' fees under Rule 37(e)(1).

Here, the Court concludes that an award of Plaintiff's attorneys' fees is an appropriate measure that is no greater than necessary to cure the prejudice resulting from the loss of Salvosa's BWC footage. *See* Fed. R. Civ. P. 37(e)(1). Plaintiff has engaged in substantial discovery and motion practice regarding the loss of Salvosa's BWC footage, which Plaintiff would not have needed to do had Salvosa's footage been appropriately preserved. In these circumstances, the Court concludes that an award of Plaintiff's attorneys' fees is a necessary measure to cure this prejudice. *See Sandoval*, 2026 WL 880396, at \*12 ("Because Plaintiffs have been prejudiced the Court will order Dustar, pursuant to Rule 37(e)(1), to pay Plaintiffs the attorney's fees and costs that Plaintiffs incurred as a result of investigating the spoliation and bringing this Motion for Sanctions before the Court."); *Vogt*, 2023 WL 2414551, at \*17 ("the Court recommends that Plaintiff be awarded her reasonable attorney fees and costs that she would not have incurred but for the County's failure to preserve the footage from Camera 18, including those she incurred in connection with the instant motion").

## IV. ORDER

For all these reasons, and based on the files, records, and proceedings herein, **IT IS ORDERED** that:

1.     Plaintiff's Motion for Discovery Sanctions against Defendant Salvosa (Dkt. 34) is **GRANTED** insofar as Plaintiff is awarded her attorneys' fees and costs incurred as a result of the discovery and motion practice she conducted regarding the loss of Salvosa's BWC footage, and is otherwise **DENIED**.

2.     Within fourteen (14) days of the date of this Order, Plaintiff must serve on Salvosa a statement of the reasonable expenses (including attorneys' fees and costs) she incurred in connection with the discovery and motion practice she conducted regarding the loss of Salvosa's BWC footage.  If Salvosa does not agree to the amount, he must file his objections on CM/ECF (along with Plaintiff's statement) within seven (7) days after receiving the amount from Plaintiff.  Plaintiff may respond to Salvosa's filing within seven (7) days after the filing.  The Court will decide the amount of fees and costs based on the papers, unless the Court determines that a hearing is necessary.  Nothing in this Order precludes the City from indemnifying Salvosa for those reasonable expenses.


Dated: May 13, 2026                                    *s/Elizabeth Cowan Wright*
                                                       ELIZABETH COWAN WRIGHT
                                                       United States Magistrate Judge

36