# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

YOLANDA MAYS, *in her individual capacity and as Trustee for the heirs and next of kin of Tommy Holmes*,

        Plaintiff,

v.

ANDREW WILLIAM SCHROEDER, *in his individual capacity*; MARK JOSEPH SUCHTA, *in his individual capacity*; ALAN DOUGLAS SALVOSA, *in his individual capacity*; and CITY OF MINNEAPOLIS,

        Defendants.

Case No. 24-cv-1736 (LMP/ECW)

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

---

Eric A. Rice, **Law Office of Eric A. Rice, LLC, St. Paul, MN**, for Plaintiff.

J. Haynes Hansen and Tracey N. Fussy, **Minneapolis City Attorney's Office, Minneapolis, MN**, for Defendants Andrew William Schroeder, Mark Joseph Suchta, and City of Minneapolis.

Jason M. Hiveley and Ashley Marie Ramstad, **Iverson Reuvers, Bloomington, MN**, for Defendant Alan Douglas Salvosa.

Plaintiff Yolanda Mays brought this action against Andrew William Schroeder and Mark Joseph Suchta (two sergeants with the Minneapolis Police Department); Alan Douglas Salvosa (an officer of the Brooklyn Center Police Department); and the City of Minneapolis (the "City"), alleging violations of her Fourth Amendment rights during a search of her home. Defendants move for summary judgment on all of Mays's claims,

1

while Mays moves for partial summary judgment against Sergeant Suchta and the City of Minneapolis based on Sergeant Suchta's conduct.  ECF Nos. 67, 69, 83.

**BACKGROUND**[1]

While investigating a homicide in March 2023, Sergeants Suchta and Schroeder received information that a vehicle used in the homicide had been at a home in Brooklyn Center, Minnesota.  ECF No. 73-1 at 30:21–31:18; ECF No. 73-2 at 18:17–19:18. Sergeants Suchta and Schroeder did not believe that the residents of the home were involved with the homicide, but they nevertheless wanted to take a statement from the residents about the vehicle.  ECF No. 73-1 at 31:15–18; ECF No. 73-2 at 19:10–18. Unfortunately, the address provided to Sergeants Suchta and Schroeder contained a typo, and rather than going to the residence where the vehicle was actually spotted, Sergeants Suchta and Schroeder went to Mays and Tommy Holmes's home.[2]  ECF No. 73-1 at 31:19– 21; ECF No. 73-2 at 18:17–20:10.

On March 21, 2023, Sergeants Suchta and Schroeder arrived at Mays and Holmes's home.  ECF No. 73-1 at 13:6–17.  Sergeant Schroeder approached the front door of the home, knocked on the door, and rang the doorbell, but no one answered the door.  *Id.* at 36:6–12, 45:18–21.  While waiting at the front door, Sergeant Schroeder noticed that mail was sticking out from the flap of an unlocked mailbox attached to the home.  *Id.* at 38:8–

---

[1]     This factual background includes only the undisputed facts in the summary-judgment record.  Disputed facts are noted as such.

[2]     Holmes was originally a Plaintiff in this action, but he passed away on May 18, 2025.  ECF No. 51 at 1.  Mays was then substituted in place of Holmes as his court-appointed trustee.  ECF No. 53.

15. Without looking inside the mailbox, Sergeant Schroeder pulled the mail out and looked at the address information on the front of the mail to see if the names on the envelopes matched the name of the person he was trying to interview. *Id.* at 45:5–46:19. Sergeant Schroeder did not open any of the mail, and he put the mail back in the mailbox after he was finished examining it. *Id.* at 45:18–21; *see* ECF No. 85.

Rather than walking to the front door, Sergeant Suchta walked into a landscaped area that was immediately next to the front porch to look into the home's front window, which looked into the living room. ECF No. 73-2 at 22:11–14; ECF No. 76 at 0:27–0:44. Sergeant Suchta explains that when two officers approach a home, one should proceed to the front door and one should stand "off to the side." ECF No. 73-2 at 22:14–23:1. Sergeant Suchta states that this is a "common tactic" that he was trained by "field training officers" at the Minneapolis Police Department to do "one hundred percent of the time." *Id.* at 22:14–23:1; 30:6–10.

The landscaped area is filled with small rocks but no plants or other objects. ECF No. 76 at 0:27–0:44. The landscaped area is not blocked off by a fence, although there is brick edging that separates it from the front yard. *Id.* The brick edging is slightly elevated from the front yard, such that someone entering the landscaped area from the front yard would need to step over the bricks. *Id.*; ECF No. 77 at 10:47–10:50. Visitors to Mays's home do not walk through the landscaped area surrounding her home, although a mail carrier uses a shoveled path in the lawn outside of the landscaped area to walk between Mays's home and her neighbor's house. ECF No. 85-2 at 56:25–58:6.

When Sergeant Suchta looked into the living room window, he saw what appeared to be an infant lying on the couch. ECF No. 73-2 at 30:14–19. The infant was not moving and appeared to have a Band-Aid on one of its fingers. *Id.* at 30:24–31:4. Sergeant Suchta added that the fingers of the doll appeared to look like "the onset of rigor mortis, kind of like a claw hand." *Id.* at 35:1–6. Sergeant Suchta discussed his observations with Sergeant Schroeder, who proceeded to walk into the landscaped area and look into the living room window. ECF No. 73-1 at 59:15–20, 71:18–72:1. Sergeants Suchta and Schroeder were unsure whether they were looking at a real child or a doll. *Id.* at 59:22–24; ECF No. 73-2 at 37:19–38:3.

Within three minutes of first seeing the purported infant, Sergeants Suchta and Schroeder radioed for emergency assistance. ECF No. 76 at 0:57–4:10. They informed emergency dispatch that there "just might" be a "possible down" at the address. *Id.* at 1:30–1:40. Brooklyn Center police officers, including Officer Salvosa, soon arrived. *Id.* at 4:50. Upon Officer Salvosa's arrival, Sergeant Suchta told him that they were at the property for a "homicide investigation," and that they had seen either an "extremely realistic doll" or "a baby that's deceased on the couch." ECF No. 77 at 10:22–10:40. Sergeant Schroeder similarly told Officer Salvosa that they were at the home on a "homicide follow-up" and observed what appeared to be a "dead baby sitting on the couch." ECF No. 74-1 at 21:11–15; ECF No. 76 at 5:07–5:25. Officer Salvosa entered the landscaped area and looked through the home's living room window, where he saw the hand of what he thought to be an infant that had a Band-Aid on it. ECF No. 74-1 at 22:5–22. Officer Salvosa began to walk around the side of the house, and Sergeant Schroeder stated that the rest of the

Brooklyn Center officers should "look at" the infant, as he and Sergeant Suchta had been looking at it for ten minutes. ECF No. 76 at 5:17–5:24.

Fearing that further delay could lead to harm for an infant, Officer Salvosa forced entry into Mays's home through a side door. *Id.* at 5:30–5:42; ECF No. 72-1 at 3. Sergeants Suchta and Schroeder followed Officer Salvosa and the other Brooklyn Center officers into Mays's home. ECF No. 76 at 5:44–5:55; ECF No. 77 at 11:20–11:55. Law enforcement quickly determined that the object on the couch was a plastic doll. ECF No. 73-2 at 53:12–54:11. Officers from the Brooklyn Center Police Department then began searching the home for any residents and found Holmes in the basement, who was "confused and irritated." *Id.* at 55:18–59:18; ECF No. 74-1 at 77:22–87:12. Law enforcement eventually left the scene, and the City of Brooklyn Center reimbursed Mays for repairs to her door. ECF No. 72-5.

Mays was not at the house while law enforcement was there. ECF No. 85-2 at 31:20–32:15. She learned about the incident from a phone call from Holmes, who was upset, "in a panic," and yelling about the police being in their home. *Id.* at 32:17–18, 35:9–11. Mays came home and saw that her door had been kicked in and there was damage to the stairs and door. *Id.* at 36:8–12. Mays feels "totally violated" because of law enforcement's intrusion into her home, and she now sleeps on her couch due to safety concerns from the incident. *Id.* at 89:13–16, 114:6–18.

Mays and Holmes sued Sergeant Suchta, Sergeant Schroeder, Officer Salvosa, and the City of Minneapolis, and based on the parties' briefing and representations at oral argument, the Court understands the operative complaint to assert four distinct claims

under 42 U.S.C. § 1983: (1) a violation of the Fourth Amendment against Sergeant Suchta for entering the curtilage of Mays's home, *see* ECF No. 54 ¶ 77; (2) a violation of the Fourth Amendment against Sergeant Schroeder for examining mail in the mailbox attached to Mays's home, *see id.* ¶¶ 16–18, 76–77; (3) a violation of the Fourth Amendment against Sergeant Suchta, Sergeant Schroeder, and Officer Salvosa for forcing entry into Mays's home, *see id.* ¶¶ 78–80; and (4) a claim for municipal liability against the City based on its alleged policies, customs, and failure to properly train Sergeant Suchta not to invade a home's curtilage, *see id.* ¶¶ 84–94.  All Defendants move for summary judgment on all claims.  ECF Nos. 67, 69.  Mays also moves for partial summary judgment against Sergeant Suchta for his alleged illegal entry onto the curtilage of Mays's home and against the City based on its purported policy, custom, or failure to train that led to Sergeant Suchta's alleged misconduct.  ECF No. 83.

## ANALYSIS

Summary judgment is proper only if "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Riedl v. Gen. Am. Life Ins.*, 248 F.3d 753, 756 (8th Cir. 2001) (citation omitted).  At this procedural juncture, the Court does "not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1024 (8th Cir. 2021) (citation omitted) (internal quotation marks omitted).  The Court must view the record in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  This approach is only "slightly modified" when a court is presented with cross-motions for summary judgment.

6

*Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012). In such a case, the Court considers each party's motion in a light most favorable to the non-moving party. *Id.*

## I.     Fourth Amendment Curtilage Claim Against Sergeant Suchta

The Court first considers Mays's claim that Sergeant Suchta violated her Fourth Amendment rights by illegally entering into the curtilage of her home and looking into her living room window. *See* ECF No. 54 ¶ 77. Sergeant Suchta asserts that he is entitled to qualified immunity on this claim. ECF No. 68 at 8–15.

Under the doctrine of qualified immunity, "a court must dismiss a complaint against a government official in his individual capacity that fails to state a claim for violation of 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity analysis requires a two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Nord v. Walsh County*, 757 F.3d 734, 738 (8th Cir. 2014) (citation omitted) (internal quotation marks omitted). Unless both questions are answered affirmatively, qualified immunity applies. *Id.*

### a.     Whether Mays Has Demonstrated a Constitutional Violation

"The Fourth Amendment protects persons against unreasonable searches and seizures by the government." *United States v. Stephen*, 984 F.3d 625, 629 (8th Cir. 2021) (emphasis omitted) (citation omitted). When it comes to the Fourth Amendment, "the

home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). At the Fourth Amendment's "very core" stands "the right of a [person] to retreat into [her] own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). The heightened protections afforded to one's home under the Fourth Amendment also extend to what courts call "curtilage," which is the area "immediately surrounding and associated with the home." *Jardines*, 569 U.S. at 6–7 (citation omitted). A law enforcement officer's physical intrusion onto curtilage is "presumptively unreasonable absent a warrant." *United States v. White*, 928 F.3d 734, 739 (8th Cir. 2019) (quoting *Collins v. Virginia*, 584 U.S. 586, 593 (2018)).

### i.      Whether the Landscaped Area Is Curtilage

Whether a particular area is part of the curtilage "requires consideration of factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *United States v. Bausby*, 720 F.3d 652, 656 (8th Cir. 2013) (citation omitted) (internal quotation marks omitted). Courts in this Circuit consider the four *Dunn* factors: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation. *United States v. Hopkins*, 824 F.3d 726, 731 (8th Cir. 2016) (citing *United States v. Dunn*, 480 U.S. 294, 301 (1987)).

The parties dispute whether the landscaped area immediately next to Mays's home constitutes curtilage. ECF No. 68 at 9 n.3; ECF No. 84 at 8–12. Applying the *Dunn* factors to the undisputed facts leads to a finding of curtilage.

Start with the proximity of the landscaped area to Mays's home.  It is undisputed that the landscaped area directly abuts Mays's home and is immediately under Mays's living room window.  ECF No. 76 at 0:27–0:44.  Indeed, by looking into the living room window from the landscaped area, Sergeant Suchta could not have gotten any closer to Mays's home.  This fact "strongly support[s]" a finding of curtilage.  *United States v. Burston*, 806 F.3d 1123, 1127 (8th Cir. 2015) (holding as much for an area six to ten inches from an apartment window); *see United States v. Conerd*, No. 14-CR-2040-LRR, 2015 WL 4599360, at *3, 7 (N.D. Iowa July 29, 2015) (holding that a side yard five to six feet from an apartment window was curtilage).

The next consideration is whether the landscaped area was included within an enclosure surrounding the home.  *Hopkins*, 824 F.3d at 731.  Sergeant Suchta says it was not because there was no "fence or other obstruction" preventing strangers from entering the landscaped area.  ECF No. 68 at 9 n.3.  But that's not what the enclosure factor from *Dunn* necessarily means.  The purpose of the enclosure factor is to determine whether "the boundaries of the curtilage [are] clearly marked" and whether any structure "serves to demark a specific area of land immediately adjacent to the house" as "readily identifiable as part and parcel of the house."  *Dunn*, 480 U.S. at 302; *see United States v. Alexander*, 888 F.3d 628, 633 (2d Cir. 2018) (citation omitted) (explaining that the enclosure factor "seeks to account for the divisions that a property owner herself has created with her property, and is premised on the notion that for most homes, the boundaries of the curtilage will be clearly marked" (internal quotation marks omitted)).  Here, the landscaped area was set off from the front yard by brick edging, which "demark[s] a specific area of land

immediately adjacent to the house" that is considered "part and parcel of the house." *Dunn*, 480 U.S. at 302; *see* ECF No. 76 at 0:27–0:44. The brick edging was slightly elevated from the front yard, such that a person entering the landscaped area from the front yard would need to step over the brick edging. ECF No. 77 at 10:47–10:50. The clear physical demarcation between the front yard and the landscaped area weighs in favor of considering the landscaped area as curtilage.

That conclusion becomes stronger when considering the cases upon which Sergeant Suchta relies. In each case, law enforcement officers were standing in the front yard of a residence. *See United States v. McGhee*, 129 F.4th 1095, 1101 (8th Cir. 2025); *Bausby*, 720 F.3d at 656–57; *Reeves v. Churchich*, 484 F.3d 1244, 1255 (10th Cir. 2007). But here, the front yard of the residence was separated from the landscaped area by the elevated brick edging. ECF No. 76 at 0:27–0:44; ECF No. 77 at 10:47–10:50. It is undisputed that Sergeant Suchta walked *beyond* the front yard, over the brick edging, and into the landscaped area to look into Mays's living room window. In doing so, Sergeant Suchta went—literally—a step too far.

As for the nature of the uses to which the landscaped area is put, *Jardines* recognized that a "side garden" is a quintessential form of curtilage. 569 U.S. at 6; *United States v. Cousins*, 455 F.3d 1116, 1122–23 (10th Cir. 2006) ("Gardening is an activity often associated with the curtilage of a home."). But Sergeant Suchta convincingly responds that there were no plants in the landscaped area. ECF No. 68 at 3; *see* ECF No. 76 at 0:27–0:44. Without plants in the landscaped area, the Court is not convinced that "reasonable

officers would expect" that the landscaped area would be used for the private activity of gardening. *United States v. Gerard*, 362 F.3d 484, 488 (8th Cir. 2004).

Sergeant Suchta also observes that the landscaped area was empty of any items, such as grills or chairs, suggesting that Mays or Holmes used the area for personal recreation. ECF No. 68 at 9 n.3; *see Dunn*, 480 U.S. at 302 (considering whether an area was put to use for the "intimate activities of the home"). But "[o]ne is not required to keep particular domestic objects on one's lawn in order to maintain a reasonable expectation of privacy," *United States v. Wells*, 648 F.3d 671, 677 (8th Cir. 2011) (alteration in original) (citation omitted), so the Court is not convinced that the absence of these items, particularly from the front of a home, undermines a finding of curtilage.

Ultimately, it is not clear the purpose for which the landscaped area was put to use—although, as discussed below, it is fairly evident that the landscaped area was not designed for walking. Because there is no evidence that the landscaped area was used for "intimate activities of the home," this *Dunn* factor weighs slightly against a finding of curtilage. *Dunn*, 480 U.S. at 302.

Last consider the steps taken by Mays to protect the landscaped area from observation by people passing by. *Hopkins*, 824 F.3d at 731. Again, there was no fence or tall barrier blocking the landscaped area from a passerby's observation. But there are several indications that Mays did not intend passersby to enter the landscaped area and look into her living room window. First, the raised brick edging separating the landscaped area from the front yard posed a small but nonetheless apparent obstacle for those seeking to enter the landscaped area, indicating that Mays viewed the landscaped area as distinct

11

from the front yard and instead "part and parcel" of her home. *Dunn*, 480 U.S. at 302; *see United States v. Carloss*, 818 F.3d 988, 1000 (10th Cir. 2016) (Tymkovich, C.J., concurring) (considering whether a "physical obstacle" would "clarif[y] to the reasonable visitor" that they were not welcome to enter an area). Second, the landscaped area was covered with small rocks—not exactly a welcome invitation for visitors to stroll through it. *See Conerd*, 2015 WL 4599360, at *8 (considering whether a resident "invit[es] persons to come onto the protected curtilage") (citing *Bausby*, 720 F.3d at 656–57); *United States v. Gregory*, 497 F. Supp. 3d 243, 264 (E.D. Ky. 2020) (highlighting that a resident "took steps to ward off visitors").

These observations are not the Court's own; rather, they are supported by Mays's undisputed testimony that visitors to her home never walk in the landscaped area, ECF No. 85-2 at 56:25–58:6, and by Sergeant Suchta's own testimony that the landscaped area "is not an area that, say, a delivery person would generally be in," ECF No. 73-2 at 29:25–30:3. Sergeant Suchta protests that Mays allowed a mail carrier to walk across her front yard via a shoveled path between Mays's home and her neighbor's house, ECF No. 68 at 9 n.3, but that fact actually cuts against him. As video from the scene makes clear, the shoveled path across Mays's front yard passed *outside of* the landscaped area, ECF No. 76 at 3:48–4:02, suggesting that Mays's mail carrier knew that though he was welcome to walk on Mays's front yard, he was not free to roam in the rocky, landscaped area.

Instructive is the Eighth Circuit's decision in *Wells*, where the court evaluated whether an unpaved driveway constituted part of the defendant's curtilage. 648 F.3d at 677–78. The Eighth Circuit recognized that the driveway was entirely visible from the

12

street but nonetheless maintained that "a homeowner may expose portions of the curtilage of his home to public view while still maintaining some expectation of privacy in those areas." *Id.* Consequently, although the defendant "certainly exposed his unpaved driveway to public view," he could also reasonably expect that "members of the public would not traipse down the drive to the back corner of his home, from where they could freely observe his entire backyard." *Id.* at 678. The same could be said here: although Mays certainly exposed the landscaped area to public view, the combination of the brick edging and small rocks in that area would lead a reasonable visitor to think twice before traipsing into the landscaped area, "from where they could freely observe [Mays's] entire [living room]." *Id.* The final *Dunn* factor therefore favors a finding of curtilage.

In sum, from the undisputed factual record, three *Dunn* factors support (one strongly so, *see Burston*, 806 F.3d at 1127) a finding that the landscaped area is curtilage, and one *Dunn* factor weighs against such a finding. On balance, then, the Court concludes that Sergeant Suchta was standing in the curtilage of Mays's home when he observed the doll in Mays's living room. *See Burston*, 824 F.3d at 1127 (concluding that an area six to ten inches from an apartment window counted as curtilage when three *Dunn* factors weighed in favor of a finding of curtilage and one *Dunn* factor weighed against a finding of curtilage).

That conclusion is also just common sense. The *Dunn* factors, while helpful, are not a "finely tuned formula" to be "mechanically applied." *Dunn*, 480 U.S. at 301. After all, the "conception defining the curtilage" is "familiar enough" that it is "easily understood from our daily experience." *Jardines*, 569 U.S. at 7 (citation omitted). And it is "easily

13

understood from our daily experience that an arm's-length from one's house is a classic exemplar of an area adjacent to the home and to which the activity of home life extends." *Morgan v. Fairfield County*, 903 F.3d 553, 561 (6th Cir. 2018) (citation omitted) (internal quotation marks omitted); *see Dow Chem. Co. v. United States*, 476 U.S. 227, 235 (1986) ("The curtilage area immediately surrounding a private house has long been given protection as a place where the occupants have a reasonable and legitimate expectation of privacy that society is prepared to accept."). Most reasonable people, the Court surmises, would find it more than a bit unsettling if a visitor bypassed the front door and instead pressed their face into the home's living room window. *See United States v. Alicea*, No. CR15-0080, 2015 WL 7460004, at *7 (N.D. Iowa Nov. 24, 2015) (finding Fourth Amendment violation when, after officers received no answer from knocking on a home's door, left the front sidewalk and started looking into a window with a flashlight). That is, however, what Sergeant Suchta did. The Court has little difficulty concluding that Mays had a "reasonable expectation of privacy" in the landscaped area immediately beneath her living room window. *Wells*, 648 F.3d at 679.

### ii.     Whether the Curtilage Search Was Reasonable

A law enforcement officer's physical intrusion onto curtilage is "presumptively unreasonable absent a warrant." *White*, 928 F.3d at 739 (citation omitted). Sergeant Suchta argues that even if he stepped into the curtilage of Mays's home, it was reasonable for him to do so for the "purpose of legitimate law enforcement activities"; specifically, "trying to make contact with residents" of the home. ECF No. 68 at 9–13. Sergeant Suchta relies on

14

the Eighth Circuit's decision in *United States v. Raines*, 243 F.3d 419 (8th Cir. 2001), but that case offers him no refuge.

In *Raines*, a police officer attempting to serve civil process "receiv[ed] no response at the front door" of a home, and so "proceeded to the back of the home," where he observed marijuana plants. 243 F.3d at 420. The officer testified that "because it was a pleasant summer evening and several cars were parked in the driveway, he thought it likely the occupants were outside in the backyard" and might be "unable to hear him knocking at the front door." *Id.* at 420–21. The Eighth Circuit found that the defendant's Fourth Amendment rights were not violated because "law enforcement officers must sometimes move away from the front door when attempting to contact the occupants of a residence." *Id.* at 421.

But the Eighth Circuit has subsequently understood *Raines* to stand for the more limited proposition that when "officers acting in furtherance of a legitimate law enforcement objective *develop a reasonable belief that someone is present in the home*, they are justified in proceeding to an alternative entrance following an unsuccessful knock at the front door." *United States v. Robbins*, 682 F.3d 1111, 1116 (8th Cir. 2012) (emphasis added); *see United States v. Anderson*, 552 F.2d 1296, 1298–1300 (8th Cir. 1977) (holding agents did not violate resident's Fourth Amendment rights by walking around house when no one answered knock at front door, agents suspected someone was home because light was visible inside house, and agents heard dog barking). Here, however, there is no evidence suggesting that Sergeants Suchta or Schroeder had any reasonable belief that someone was present in Mays's home when Sergeant Suchta looked through Mays's living

15

room window (counsel for Sergeants Suchta and Schroeder conceded as much at oral argument). Indeed, Suchta looked in the window of Mays's home nearly immediately upon arriving, ECF No. 76 at 0:27–0:44, and he explains that looking through a house's window is a "common tactic" he "always" does when approaching a house with another officer, ECF No. 73-2 at 30:6–13. That confirms that, regardless of any reasonable belief that someone was inside Mays's house, Sergeant Suchta intended to look into her living room window.

Sergeant Suchta reads *Raines* more broadly, arguing that nothing in that case requires law enforcement to believe that someone is at the residence before intruding into the curtilage. ECF No. 99 at 2–6. But that's exactly how the Eighth Circuit understood *Raines* in 2012. *See Robbins*, 682 F.3d at 1116. Moreover, Sergeant Suchta's broader reading would conflict with the Eighth Circuit's 2011 decision in *Wells*, which rejected the notion that police may "forgo the knock at the front door and, without any reason to believe the homeowner will be found there, proceed directly to the [curtilage]." 648 F.3d at 680. That conduct falls outside the legitimate law enforcement action that *Raines* permits.

Sergeant Suchta offers no other reason why his physical intrusion into the curtilage of Mays's home was permitted under the Fourth Amendment. Consequently, the undisputed factual record demonstrates that Sergeant Suchta violated Mays's Fourth Amendment rights.

### b.      Whether Mays's Constitutional Right Was Clearly Established

Having demonstrated that Sergeant Suchta violated Mays's Fourth Amendment rights, Mays must also show that those rights were clearly established to defeat qualified

16

immunity.  "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citation omitted) (internal quotation marks omitted).  Courts do not "define clearly established law at a high level of generality."  *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (citation omitted).  Instead, courts "look for a controlling case or a robust consensus of cases of persuasive authority," and although there "need not be a prior case directly on point," existing precedent "must have placed the statutory or constitutional question beyond debate."  *Thurmond v. Andrews*, 972 F.3d 1007, 1012 (8th Cir. 2020) (citation omitted).  A court evaluates whether the right was clearly established at the time of the alleged constitutional violation.  *See Est. of Nash v. Folson*, 92 F.4th 746, 759 (8th Cir. 2024).

Mays's Fourth Amendment right to be free of the unreasonable invasion of her home's curtilage was clearly established by March 2023.  Start at the highest level of generality: it has been clearly established since at least 1984 (and likely earlier) that curtilage is entitled to the Fourth Amendment protections that attach to the home.  *See Oliver v. United States*, 466 U.S. 170, 180 (1984).  Zoom in, and in 2013, the Supreme Court explained that the Fourth Amendment's protection of the curtilage is violated if police "enter a man's property to observe his repose from just outside the front window" (*i.e.*, exactly what happened here).  *Jardines*, 569 U.S. at 6.  Zoom in even more granularly: in 2015, the Eighth Circuit determined that an area "six to ten inches" from a home's window counted as curtilage.  *Burston*, 806 F.3d at 1127.

17

Between *Oliver*, *Jardines*, and *Burston*, it was clearly established by at least March 2023 that standing mere inches from a home's front window to look inside counts as an invasion of the curtilage. *See Jardines*, 569 U.S. at 6; *Burston*, 806 F.3d at 1127. Indeed, *Jardines*'s language about looking into a person's "repose from just outside the front window" maps perfectly onto this case, 569 U.S. at 6, and Sergeants Suchta and Schroeder stood about the same distance—if not closer—to a home's window than the officer in *Burston*, *see* 806 F.3d at 1127. Any reasonable officer "would have understood that" standing in a rocky, landscaped area to peer into a home's front window—absent any indication that someone was in the house—violated the curtilage protections of the Fourth Amendment.[3] *Mullenix*, 577 U.S. at 11; *see Chong v. United States*, 112 F.4th 848, 858 (9th Cir. 2024) (quoting *Morgan*, 903 F.3d at 561) (explaining that it is "easily understood from our daily experience that an arm's-length from one's house is a classic exemplar" of curtilage). Because the undisputed factual record demonstrates a violation of Mays's clearly established Fourth Amendment rights, the Court grants Mays's motion as it relates to Sergeant Suchta's unlawful entry into the curtilage of Mays's home. The Court concurrently denies Sergeant Suchta's motion for summary judgment on that claim.

---

[3]    To the extent that Sergeant Suchta asserts that he reasonably relied on *Raines* to step into the landscaped area and look into Mays's living room, that reliance is unreasonable, for the Eighth Circuit explained in 2012 that *Raines* applies when law enforcement "develop a reasonable belief that someone is present in the home." *Robbins*, 682 F.3d at 1116. As explained above, neither sergeant had any belief—let alone a reasonable one— that anyone was in Mays's house when Sergeant Suchta entered the curtilage.

18

## II.      Fourth Amendment Curtilage Claim Against Sergeant Schroeder

Mays alleges that Sergeant Schroeder also infringed on her home's curtilage.  ECF No. 54 ¶ 77.  Based on the parties' briefing and representations at oral argument, the Court understands this claim to relate to Sergeant Schroeder's examination of Mays's mail.  Only Sergeant Schroeder seeks summary judgment on this claim.  ECF No. 68 at 15–17.

Sealed letters sent through the mail are "papers" within the meaning of the Fourth Amendment.  *See Ex parte Jackson*, 96 U.S. 727, 733 (1877); *see United States v. Johnson*, 171 F.3d 601, 603 (8th Cir. 1999) (noting that Fourth Amendment applies to items placed in the mail).  That said, a person lacks a "reasonable expectation of privacy [as] to the information visible on the outside of the envelope."  *Roskens v. Graham*, 435 F. Supp. 3d 955, 974 (N.D. Iowa 2020) (citing *Ex parte Jackson*, 96 U.S. at 733); *see also United States v. Osunegbu*, 822 F.2d 472, 480 n.23 (5th Cir. 1987) ("[A]n addressee or addressor generally has no expectation of privacy as to the outside of mail."); *United States v. Hinton*, 222 F.3d 664, 675 (9th Cir. 2000) ("There is no expectation of privacy in the addresses on a package.").  Nor is there any reasonable expectation of privacy in an accessible mailbox because a resident has "every expectation that governmental officials would regularly open the box to deliver mail."  *United States v. Lewis*, 738 F.2d 916, 919 n.2 (8th Cir. 1984); *see, e.g.*, *Osunegbu*, 822 F.2d at 478–80; *Hinton*, 222 F.3d at 676; *State v. Champion*, 594 N.W.2d 526, 529 (Minn. Ct. App. 1999); *see also United States v. Green*, No. CR 19-05-BLG-SPW-02, 2019 WL 1643661, at *6 (D. Mont. Apr. 16, 2019) ("Most jurisdictions that have considered this question . . . have held that a person has no reasonable expectation of privacy in an unlocked accessible mailbox.").

Because Mays lacked a reasonable expectation of privacy in the contents of her unlocked mailbox or the outside of her envelopes, Sergeant Schroeder did not violate the Fourth Amendment by opening Mays's unlocked mailbox, examining the outside of Mays's mail, and then putting the mail back in the box. ECF No. 73-1 at 45:5–21; *see* ECF No. 85. Resisting that conclusion, Mays argues that a search of the mailbox violated the Fourth Amendment's prohibition on warrantless intrusions into the curtilage of her home. ECF No. 95 at 17. Mays cites no case law for that argument, likely because, as noted above, the case law cuts against Mays's position. Curtilage is "intimately linked to the home, both physically and psychologically," and is where "privacy expectations are most heightened." *Jardines*, 569 U.S. at 7 (citation omitted). But, as the Eighth Circuit explained in *Lewis*, any expectation of privacy in one's unlocked mailbox is diminished because mail carriers—that is, government officials—regularly open and access the mailbox. *Lewis*, 738 F.2d at 919 n.2; *see Champion*, 594 N.W.2d at 529 ("[N]ot only is it unreasonable for an occupant to expect protection of his or her mailbox from outside intrusion, but protection from such intrusion is also not a societal expectation."); *see also* ECF No. 85-2 at 56:25–58:6 (describing the well-trod path in Mays's front yard for the mail carrier to deliver letters to her home). Mays furnishes no reasoned justification for treating her unlocked mailbox as "part and parcel" of her home. *Dunn*, 480 U.S. at 302. Accordingly, the Court grants Sergeant Schroeder's motion for summary judgment as it relates to the claim that he opened Mays's unlocked mailbox and examined the outside of her mail.

20

### III.    Entry Into Mays's Home

Mays next alleges Sergeant Suchta, Sergeant Schroeder, and Officer Salvosa violated the Fourth Amendment when they forced entry into her home.  ECF No. 54 ¶¶ 78–80.  All three defendants seek summary judgment on this claim, arguing that exigent circumstances justified their warrantless entry into Mays's home.  ECF No. 68 at 17–26; ECF No. 71 at 7–12.  That argument works for Officer Salvosa but not for Sergeants Suchta and Schroeder.

### a.    Sergeants Suchta and Schroeder

Sergeants Suchta and Schroeder claim that their warrantless entry into Mays's home was justified by exigent circumstances—that is, seeing what they believed to be an infant deceased or in medical distress—and at the very least protected by qualified immunity. ECF No. 68 at 17–26.

Officers may enter a home without a warrant in exigent circumstances—that is, when "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable."  *Lange v. California*, 594 U.S. 295, 301 (2021) (citation modified).  A warrantless search may be objectively reasonable to handle an "emergency" that demands a "compelling need for official action" with "no time to secure a warrant."  *Missouri v. McNeely*, 569 U.S. 141, 149 (2013) (citation omitted). Police may, for example, "enter a home without a warrant to render emergency assistance to an injured occupant."  *Lange*, 594 U.S. at 301 (citation omitted).

Sergeants Suchta and Schroeder vigorously argue that they were justified in believing that the doll on the couch was an infant in need of medical assistance.  ECF

21

No. 68 at 17–26.  But their exigent-circumstances argument falters at the outset because the exigent-circumstances exception does not apply when police "create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 462 (2011).  More specifically, police cannot "gain entry to premises by means of an actual or threatened violation of the Fourth Amendment" and then claim exigent circumstances.[4]  *Id.* at 469.  Here, Sergeants Suchta and Schroeder only witnessed the doll because Sergeant Suchta violated the Fourth Amendment by entering the curtilage of Mays's home and peering through her living room window.  *See* ECF No. 76 at 0:27–0:44.  Because Sergeant Suchta created the exigency by violating the Fourth Amendment, neither he (nor Sergeant Schroeder, who witnessed Sergeant Suchta's Fourth Amendment violation, *see id.*) can rely on the exigent-circumstances exception.  *King*, 563 U.S. at 462; *see United States v. Sanders*, 4 F.4th 672, 677 (8th Cir. 2021) (explaining that a court evaluating a claim of exigent circumstances "look[s] to the facts known to the officers at the time they made the decision to enter").

Qualified immunity does not save Sergeants Suchta and Schroeder.  As explained above, Sergeant Suchta violated Mays's clearly established Fourth Amendment rights by peering into her front window from her home's curtilage.  Sergeant Schroeder witnessed

---

[4]    In fairness, Mays did not raise *King* in her summary-judgment briefing.  But when law enforcement creates the exigency by violating the Fourth Amendment, it may not, as a matter of law, invoke the exigent circumstances exception to the Fourth Amendment.  *See King*, 563 U.S. at 462.  Because the officer-created exigency issue is "antecedent to" and "ultimately dispositive of" Sergeant Suchta's and Sergeant Schroeder's claims of exigent circumstances, and because the issue was raised during oral argument, the Court elects to consider it.  *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993) (citation omitted).

Sergeant Suchta enter the curtilage and look into Mays's front window. ECF No. 76 at 0:27–0:44. At that point, any reasonable officer would have understood that Sergeant Suchta had violated Mays's Fourth Amendment rights. And it was clearly established by 2011 that police may not rely on exigent circumstances when they "create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment." *King*, 563 U.S. at 462. Any reasonable officer would have therefore concluded that having committed or witnessed a violation of the Fourth Amendment's curtilage protections, they could not now invoke exigent circumstances to force entry into a home. Accordingly, Sergeants Suchta and Schroeder's motion for summary judgment on the Fourth Amendment claim arising from their entry into Mays's home is denied.

### b.   Officer Salvosa

The outcome is different for Officer Salvosa, who also asserts exigent circumstances and qualified immunity. ECF No. 71 at 7–12. In examining Officer Salvosa's conduct, the Court "look[s] to the facts known to [him] at the time [he] made the decision to enter" Mays's home. *Sanders*, 4 F.4th at 677. Here, it is undisputed that before entering Mays's home, Officer Salvosa (1) knew that Sergeants Suchta and Schroeder stopped by Mays's home for a homicide investigation; (2) knew that Sergeants Suchta and Schroeder had seen either a realistic doll or an infant in distress in Mays's living room; and (3) saw what he thought was an infant in Mays's living room that was not moving. *See* ECF No. 74-1 at 20:6–23:1, 65:23–70:14; ECF No. 76 at 5:07–5:25; ECF No. 77 at 10:22–10:40. Crucially, Officer Salvosa was never informed of *how* Sergeants Suchta and Schroeder came to view the doll, so Officer Salvosa had no reason to believe that the doll was seen

23

only because of a Fourth Amendment curtilage violation.  Based on the facts known to Officer Salvosa at the time he entered the house, *see Sanders*, 4 F.4th at 677, Officer Salvosa would not have known that he was responding only to an exigency created by Sergeants Suchta and Schroeder.  Accordingly, the threshold issue that thwarted Sergeants Suchta's and Schroeder's exigent-circumstances arguments does not apply to Officer Salvosa.

That conclusion makes sense in the context of a Section 1983 suit, in which "a plaintiff must plead that each Government-official defendant, *through the official's own individual actions*, has violated the Constitution."  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *see also Smith v. City of Minneapolis*, 754 F.3d 541, 547 (8th Cir. 2014) ("Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed.  Section 1983 does not sanction tort by association.").  It would be perverse to hold that Officer Salvosa could not invoke the exigent-circumstances exception when he neither knew of Sergeant Suchta's curtilage violation nor was he alleged to have engaged in any curtilage violation himself.  Because there is no evidence of Officer Salvosa's "personal involvement" in violating Mays's Fourth Amendment curtilage protections, he may invoke the exigent-circumstances exception. *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (citation omitted).

But whether Officer Salvosa can invoke the exception is a different question from whether it applies.  As noted above, police may "enter a home without a warrant to render emergency assistance to an injured occupant." *Lange*, 594 U.S. at 301 (citation omitted). Police must have an "objectively reasonable basis for believing" that an occupant in the

home is in need of immediate aid. *United States v. Quarterman*, 877 F.3d 794, 797 (8th Cir. 2017) (citation omitted). Unresponsiveness "certainly qualifies as the type of medical emergency where law enforcement must act quickly as the chances of recovery wane with each passing second." *United States v. Burton*, No. 23-cr-347 (PJS/LIB), 2024 WL 2883737, at *8 (D. Minn. Apr. 25, 2024), *report and recommendation adopted*, 2024 WL 2883289 (D. Minn. June 7, 2024); *see United States v. Black*, 129 F.4th 508, 512–13 (8th Cir. 2025). In his deposition, Officer Salvosa maintained that when he looked through Mays's window, he saw what he "thought was an infant" that "wasn't moving" with a realistic BandAid on its finger. ECF No. 74-1 at 22:6–22, 69:18–19. No doubt these circumstances presented an "objectively reasonable basis" for an exigency necessary to enter Mays's house. *Quarterman*, 877 F.3d at 797; *see Black*, 129 F.4th at 512–13; *Burton*, 2024 WL 2883737, at *8.

Mays objects to this conclusion on various grounds, none of which are availing. She first points out that other officers noted that the doll "differed in appearance from a real baby due to the face, plastic sheen, and general appearance." But the evidence Mays cites for this proposition relates to officers' observations *after* they entered Mays's house and viewed the doll up close. ECF No. 73-1 at 87:24–88:8; ECF No. 73-2 at 53:12–53:11. Officer Salvosa testified that when he saw the doll through the window, he did not see a plastic sheen on the doll; rather, he saw what he "thought was an infant." ECF No. 74-1 at 22:6–22, 69:20–70:1; *see also id.* at 65:23–66:1 (Salvosa testifying that he "physically saw" a "lifelike infant"). Because the doll's artificial appearance was undisputedly not

25

"known to [Officer Salvosa] at the time [he] made the decision to enter" Mays's home, it is irrelevant to the exigent-circumstances analysis. *Sanders*, 4 F.4th at 677.

Mays next observes that Sergeant Suchta told Officer Salvosa that he and Sergeant Schroeder were unsure whether the object in Mays's living room was a doll or a real infant, which should have alerted Officer Salvosa "that a doll was on the couch and that no exigency existed." ECF No. 97 at 6. But that argument "relies too heavily on hindsight," which both the Supreme Court and the Eighth Circuit have resisted in evaluating an officer's judgment that exigent circumstances existed. *United States v. Ball*, 90 F.3d 260, 264 (8th Cir. 1996); *see Michigan v. Fisher*, 558 U.S. 45, 49 (2009) (per curiam). As Officer Salvosa persuasively explained in his deposition:

> In the context of we think this baby is not breathing, how much time do I give myself? I mean, again, it's kind of like someone falls and you go, "I wonder if he's hurt." How long do I wait before I go over there and say, "Are you okay?" . . . If there's an emergency and I think a baby is about to die, am I going to waste three hours to get a warrant?

ECF No. 74-1 at 62:7–11, 67:23–25 (citation modified). Although Sergeant Suchta indeed told Officer Salvosa that he and Sergeant Schroeder were not sure whether the object they saw was an infant or a doll, ECF No. 77 at 10:22–10:40, Officer Salvosa himself looked at the item and concluded that it was a real infant in distress, an assertion he steadfastly maintained during his deposition, ECF No. 74-1 at 22:6–11, 61:17–62:18, 65:11–66:2, 68:2–8. The Court will not second guess Officer Salvosa's "objectively reasonable basis" for entering Mays's house. *Quarterman*, 877 F.3d at 797; *see Fisher*, 559 U.S. at 49 (rejecting lower court's "hindsight determination that there was in fact no emergency").

26

Mays next notes that she had previously provided her garage code to the Brooklyn Center Police Department and indicated that a key to her house was in the garage. ECF No. 97 at 2 (citing ECF No. 96-1 at 1). Mays argues that Officer Salvosa could have accessed that information, grabbed the key, and entered her house without destroying her side door. *Id.* It is wholly unclear how this fact relates to the exigent-circumstances inquiry; Mays cites no authority holding that, having detected exigent circumstances in a home, law enforcement must use the gentlest means to enter the home. In any event, Officer Salvosa testified at his deposition that he was not aware of this fact when he entered the home, ECF No. 74-1 at 71:20–72:10, and Mays cites no evidence contradicting Officer Salvosa's account. That fact, which was not known to Officer Salvosa when he entered Mays's house, is therefore irrelevant in the exigent-circumstances analysis. *Sanders*, 4 F.4th at 677.

Mays finally observes that ten minutes passed between Sergeants Suchta and Schroeder viewing the doll and Officer Salvosa viewing the doll, which purportedly undermines the argument that an imminent exigency existed. ECF No. 97 at 6. But again, Officer Salvosa testified during his deposition that he had no clue how long Sergeants Suchta and Schroeder had been at Mays's home, ECF No. 74-1 at 46:2–7, which means this fact was not "known to [Officer Salvosa] at the time [he] made the decision to enter" Mays's home and cannot be used to undermine his claim of exigent circumstances,

27

*Sanders*, 4 F.4th at 677.[5]   Officer Salvosa is therefore entitled to summary judgment on Mays's Fourth Amendment claim.

## IV.   *Monell* Claim

Both Mays and the City seek summary judgment on the *Monell* claim against the City related to Sergeant Suchta's curtilage violation.   ECF No. 68 at 23–26; ECF No. 84 at 14.   A municipality cannot be held liable for a constitutional violation under Section 1983 solely because it employs a tortfeasor.   *See Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 691 (1978).   Rather, liability for a constitutional violation would attach to a municipality only if the violation resulted from: (1) an official municipal policy; (2) an unofficial custom; or (3) a deliberately indifferent failure to train or supervise an official or employee.   *Bolderson v. City of Wentzville*, 840 F.3d 982, 985 (8th Cir. 2016).

Here, Sergeant Suchta stated during his deposition that when approaching a home with another officer, he was taught by "field training officers" with the Minneapolis Police Department that one officer should go to the front door, and another should go "off to the side."   ECF No. 73-2 at 22:14–23:1.   Mays argues that this testimony presents a winning *Monell* claim.   The Court disagrees.

---

[5]   Mays asserts Sergeant Schroeder's statement that he and Sergeant Suchta had been looking at the doll for ten minutes was made "[w]ithin [Officer] Salvosa's earshot."   ECF No. 97 at 3.   But Officer Salvosa testified that he did not hear that statement, ECF No. 74-1 at 46:2–7, and Mays only offers her own speculation that Officer Salvosa heard Sergeant Schroeder's statement, which is insufficient to avoid summary judgment, *Bloom v. Metro Heart Grp. of St. Louis, Inc.*, 440 F.3d 1025, 1028 (8th Cir. 2006).   In sum, then, there is no genuine factual dispute in this record over whether Officer Salvosa heard Sergeant Schroeder's statement: he did not.

### a.    Official Municipal Policy

An official policy is "a deliberate choice to follow a course of action" by an "official who is determined by state law to have the final authority to establish governmental policy." *Ware v. Jackson County*, 150 F.3d 873, 880 (8th Cir. 1998) (citation modified). An official-policy *Monell* claim therefore requires that the challenged policy be made by someone with "final policymaking authority" for the municipality. *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013). Here, however, Mays offers no evidence that the "field training officers" who trained Sergeant Suchta had "final policymaking authority" for the City. ECF No. 73-2 at 22:14–23:1. Ordinarily, the individual with "final policymaking authority" over a city police department is the police chief, *see Ware*, 150 F.3d at 886–87 (collecting cases), but Mays offers no evidence or argument that these "field training officers" possess authority to set training policies commensurate with the City's police chief or other municipal leaders. Mays fails to show an official municipal policy.

### b.    Unofficial Custom

A municipal custom "is a practice of municipal officials that is not authorized by written law, but which is so permanent and well-settled as to have the force of law." *Russell v. Hennepin County*, 420 F.3d 841, 849 (8th Cir. 2005) (citation modified). That custom must encompass "a widespread and persistent pattern of unconstitutional misconduct . . . policymakers were either deliberately indifferent to or tacitly authorized." *Leonard v. St. Charles Cnty. Police Dep't*, 59 F.4th 355, 363 (8th Cir. 2023) (citation omitted). "Notice is the touchstone of deliberate indifference" for a *Monell* claim. *Atkinson*, 709 F.3d at 1216.

29

The Eighth Circuit has not drawn a bright line for how many incidents of unconstitutional acts suffice to allege an unofficial custom under *Monell*. *Tirado v. City of Minneapolis*, 521 F. Supp. 3d 833, 841 (D. Minn. 2021). But this much is clear: "An unconstitutional custom or usage cannot arise from a single act." *Bolderson*, 840 F.3d at 986.

Here, Mays only offers one incident of an unconstitutional act based on the City's alleged custom of violating residents' curtilage protections—her own experience. Mays argues that Sergeant Suchta's admission—that standing off to the side of a resident's home was a "common tactic" he was trained to do "one hundred percent of the time"—shows a widespread pattern of unconstitutional misconduct. ECF No. 84 at 15. But that vague deposition testimony is not enough, for Mays "has produced no evidence regarding the factual background of these previous" incidents, "nor has she shown that the incidents giving rise to these [constitutional violations] bear any factual similarity" to Sergeant Suchta's violation of Mays's Fourth Amendment curtilage protections. *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999); *see D.B. v. Hargett*, No. 13-cv-2781 (MJD/LIB), 2014 WL 1371200, at *7 n.10 (D. Minn. Apr. 8, 2014) (dismissing *Monell* claim when the plaintiff failed to plead specific facts that would allow the court to conclude that "prior incidents" were sufficiently similar to the plaintiff's experience to "constitute a pattern of behavior"). Lacking any facts about these purported previous incidents, Mays is left only with her own constitutional violation, which is legally insufficient to show an unofficial custom under *Monell*. *Bolderson*, 840 F.3d at 986.

### c.    Failure To Train

To succeed on a failure-to-train claim, Mays must prove that: (1) the City's training practices were inadequate; (2) the City was deliberately indifferent to the rights of others in adopting them, such that the "failure to train" reflects the City's deliberate or conscious choice; and (3) an alleged deficiency in the training procedures actually caused Mays's injury. *See Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996). A municipality may demonstrate deliberate indifference when it has "[r]eceived notice of a pattern of unconstitutional acts committed by [its employees]." *Atkinson*, 709 at 1216–17 (citation omitted). But as explained above, Mays only describes a single incident of unconstitutional conduct—her own—meaning that the City could not have been on "notice" of a pattern of unconstitutional conduct when Sergeant Suchta violated Mays's Fourth Amendment rights. *See Brewington v. Keener*, 902 F.3d 796, 803 (8th Cir. 2018).

A municipality may also demonstrate deliberate indifference when, although there is no pattern of constitutional violations, the municipality nonetheless "failed to train its employees to handle recurring situations presenting an obvious potential for such a [constitutional] violation." *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)). To determine whether the need for training was obvious, the Court considers whether a municipal employee violated a "clear constitutional duty." *Dundon v. Kirchmeier*, 85 F.4th 1250, 1258 (8th Cir. 2023) (citation omitted); *see Szabla*, 486 F.3d at 393 (considering whether a constitutional rule was "clearly established" to warrant training on the rule).

31

In this case, Sergeant Suchta stated during his deposition that when approaching a home with another officer, he was trained by the Minneapolis Police Department that one officer should go to the front door, and another should stand "off to the side." ECF No. 73-2 at 22:14–23:1. Notably, Sergeant Suchta did *not* testify that he was trained to stand off to the side *and look through a home's front window*. Had he testified to *that*, Sergeant Suchta's training likely would violate "clearly established" constitutional rules on curtilage protections, as explained in the qualified immunity analysis above. *Szabla*, 486 F.3d at 393. But Sergeant Suchta only stated that he was trained to stand "off to the side," and as the City astutely notes, there are many ways that an officer can stand "off to the side" of an officer at the front door without violating Fourth Amendment curtilage protections. *See* ECF No. 99 at 19 ("It is entirely possible that an officer can 'stand off to the side' while their partner knocks without violating the Fourth Amendment, depending on the specific facts of the situation, such as the layout of the house and yard, the implied license of the property, and the facts of the encounter."). Because Sergeant Suchta's testimony does not establish that the City failed to train him on a "clear constitutional duty," Mays fails to demonstrate the City's deliberate difference. *Dundon*, 85 F.4th at 1258. Relatedly, because the City's training instructed Sergeant Suchta to do something facially lawfully—that is, stand "to the side"—Mays fails to show a "direct causal link" between his lawful training and his unlawful conduct. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see Freeman v. Madison County*, No. 5:23-cv-5065, 2024 WL 3049926, at *5 (W.D. Ark. June 18, 2024)

32

(rejecting failure-to-train *Monell* claim when "there is no evidence that [the officer's] actions were the result of anything other than his own shortcomings").[6]

Because Mays does not assert that the City is liable for any other unconstitutional conduct under *Monell*, the Court grants the City's motion for summary judgment on the *Monell* claim and denies Mays's competing motion for summary judgment.

## CONCLUSION

For these reasons, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The Motion for Partial Summary Judgment (ECF No. 83) of Yolanda Mays is **GRANTED IN PART** (as to Sergeant Mark Joseph Suchta) **and DENIED IN PART** (as to the City of Minneapolis);

2. The Motion for Summary Judgment (ECF No. 67) of the City of Minneapolis, Sergeant Andrew William Schroeder, and Sergeant Mark Joseph Suchta is **GRANTED IN PART** (as to the City and the claim against Sergeant Schroeder related to the examination of Mays's mail) and **DENIED IN PART** (as to Sergeant Suchta and the claim that Sergeant Schroeder wrongfully entered Mays's house); and

3. The Motion for Summary Judgment (ECF No. 69) of Officer Alan Douglas Salvosa is **GRANTED**.

Dated: August 5, 2026                          *s/Laura M. Provinzino*
                                               Laura M. Provinzino
                                               United States District Judge

---

[6]   Notably, Sergeant Suchta testified during his deposition that he was trained by the City on the Fourth Amendment and the principle of curtilage, which he defined as "land that surrounds the house that belongs to the actual homeowner." ECF No. 73-2 at 27:3–12. That confirms that Sergeant Suchta's illegal conduct should be chalked up only to his "own shortcomings," not to any inadequate training by the City. *Freeman*, 2024 WL 3049926, at *5.